# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| MSP RECOVERY CLAIMS, SERIES LLC, | ) | |
| a Delaware series limited liability company; | ) | Case No.: |
| and MSPA CLAIMS 1, LLC, a Florida limited | ) | |
| liability company, | ) | COMPLAINT |
| | ) | |
|       Plaintiffs, | ) | DEMAND FOR JURY TRIAL |
| | ) | |
| v. | ) | |
| | ) | |
| ALLERGAN PLC, an Irish public limited | ) | |
| company; FOREST LABORATORIES, LLC, | ) | |
| a Delaware limited liability company; MERZ | ) | |
| GMBH & CO. KGAA, a German corporation; | ) | |
| MERZ PHARMA GMBH & CO. KGAA, a | ) | |
| German corporation; MERZ | ) | |
| PHARMACEUTICALS GMBH, a German | ) | |
| corporation; BARR PHARMACEUTICALS, LLC, | ) | |
| a Delaware limited liability company; TEVA | ) | |
| PHARMACEUTICALS USA, INC., a Delaware | ) | |
| corporation; TEVA PHARMACEUTICAL | ) | |
| INDUSTRIES, LTD., an Israeli corporation; | ) | |
| AMNEAL PHARMACEUTICALS, LLC, a | ) | |
| Delaware limited liability company; COBALT | ) | |
| LABORATORIES, LLC; a Delaware limited | ) | |
| liability company; UPSHER-SMITH | ) | |
| LABORATORIES, INC., a Minnesota corporation; | ) | |
| WOCKHARDT LIMITED, an Indian company; | ) | |
| WOCKHARDT USA LLC, a Delaware limited | ) | |
| liability company; SUN PHARMACEUTICALS | ) | |
| INDUSTRIES, LTD., an Indian company; DR. | ) | |
| REDDY'S LABORATORIES LTD., an Indian | ) | |
| company; and DR. REDDY'S LABORATORIES | ) | |
| INC., a New Jersey corporation, | ) | |
| | ) | |
|       Defendants. | ) | |

## <u>COMPLAINT</u>

Plaintiffs, MSP Recovery Claims, Series LLC, a Delaware series limited liability company

and MSPA Claims 1, LLC, a Florida limited liability company (collectively "Plaintiffs"), bring

this action against Allergan plc, an Irish public limited company, Forest Laboratories, LLC, a Delaware limited liability company (collectively "Forest"); Merz GmbH & Co. KgaA, a German corporation, Merz Pharma GmbH & Co. KgaA, a German corporation, and Merz Pharmaceuticals GmbH, a German corporation (collectively "Merz"), Barr Pharmaceuticals, LLC, a Delaware limited liability company ("Barr"), Teva Pharmaceuticals USA, Inc., a Delaware corporation, Teva Pharmaceutical Industries, Ltd., an Israeli company (collectively "Teva"); Amneal Pharmaceuticals, LLC, a Delaware limited liability company ("Amneal"); Cobalt Laboratories, LLC, a Delaware limited liability company ("Cobalt"), Upsher-Smith Laboratories, Inc., a Minnesota corporation ("Upsher-Smith"), Wockhardt Limited, an Indian company, Wockhardt USA LLC, a Delaware limited liability company (collectively "Wockhardt"); Sun Pharmaceuticals Industries, Ltd. ("Sun"), an Indian company, Dr. Reddy's Laboratories Ltd., an Indian company, and Dr. Reddy's Laboratories, Inc., a New Jersey corporation (collectively "Dr. Reddy's") (collectively "Generic Manufacturer Defendants"), and allege as follows:

## NATURE OF THE ACTION

1.      Plaintiffs are assignees of recovery rights originally held by Medicare Advantage Plans ("MA Plans"), including Medicare Advantage Organizations, Health Maintenance Organizations, Management Service Organizations, Independent Physician Associations, and other Medicare first tier and downstream entities, providing Medicare benefits to their beneficiaries. (These entities are generally referred to herein as "Medicare Advantage Plans" or "MA Plans"). Plaintiffs bring this action to challenge Defendants' monopolistic and anticompetitive behavior regarding the drug Namenda® ("Namenda").

2.      Namenda is a branded pharmaceutical product containing the active ingredient memantine hydrochloride used for treatment in Alzheimer's disease. It is sold by Forest Laboratories, LLC ("Forest").[1] The brand-name Namenda includes three different dosage forms: immediate release tablets ("Namenda IR"); oral solution ("Namenda Oral"); and extended release tablets ("Namenda XR").

3.      In June 2000, Forest obtained the exclusive rights to license, develop and market Namenda in the United States under U.S. Patent No. 5,061,703 (the "'703 patent"), which is owned by Merz. Forest and Merz claim the '703 patent covers the use of memantine hydrochloride to treat Alzheimer's disease.

4.      In December 2002, Forest submitted a New Drug Application ("NDA") to the U.S. Food and Drug Administration ("FDA"), seeking approval to market memantine hydrochloride immediate release tablets (5 mg and 10 mg) branded as "Namenda" for the treatment of Alzheimer's.

5.      On October 16, 2003, the FDA approved Namenda IR tablets for use in the treatment of moderate to severe dementia of the Alzheimer's type. Namenda IR was launched in the U.S. market in January 2004.

6.      After Namenda IR's FDA approval, Forest enjoyed a period of market exclusivity, whereby other manufacturers could not market more low-cost generic versions of Namenda IR. Forest's market exclusivity was set to end upon the expiration of the '703 patent in April 2010.

---

[1] Forest was acquired by, and became a wholly owned subsidiary of, Actavis plc on July 1, 2014. Actavis plc began operating under the name Allergan plc on or about June 15, 2015. Unless the context indicates otherwise, all references to "Forest" include successors in interest Actavis plc and Allergan plc.

7.      Forest sought and received a five-year patent extension as compensation for the time spent obtaining FDA approval, extending the patent expiration date to April 11, 2015.

8.      Forest was also granted pediatric exclusivity by the FDA in 2014, which extended its period of market exclusivity for Namenda until October 11, 2015.

9.      Plaintiffs allege that Forest and Merz engaged in the following anticompetitive behavior to improperly block generic competition for Namenda IR: (1) Forest and Merz conspired with at least a dozen generic manufacturers of AB-rated generic versions of Namenda IR to quit their legal challenge to the '703 patent and delay launch until after the expiration of the '703 patent in order to obtain competitive protection from each other through a "contingent launch" provision in their various settlement agreements with Forest[2]; then (2) using this improperly obtained period of additional exclusivity to launch the successor brand-name product, Namenda XR, and force the conversion of the memantine hydrochloride market from Namenda IR to the clinically equivalent (but not superior) Namenda XR. Forest's goal was to convert as much of the market as possible to Namenda XR prior to market entry of generic versions of Namenda IR because the generics would not be AB-rated to Namenda XR (since Namenda IR is taken twice-daily and Namenda XR is taken once-daily). Because the generic versions of Namenda IR would not be AB-rated to Namenda XR[3], pharmacists could not automatically substitute the generics for brand-name Namenda. Forest intentionally sought to destroy the normal market competitive forces that exist

---

[2] Contingent launch provisions provide that the generic manufacturer may enter the market the earlier of: (a) the expiration of the agreed delay period, or (b) the date on which any other generic manufacturer launches a generic product. Thus, each generic manufacturer agrees to delay its market entry on the express condition that every other generic manufacturer does the same and for the same period of time.

[3] Generic Namenda IR products would not be "AB-rated" equivalents to Namenda XR because Namenda IR is taken twice-daily and Namenda XR is taken once-daily.

between a brand-name drug and AB-rated generic counterparts as intended by Congress via the Hatch-Waxman Act of 1984.

10.     In the fall of 2007, 14 or more generic manufacturers, including Barr, Teva, Cobalt, Orchid Chemicals & Pharmaceuticals Ltd. ("Orchid"), Lupin Pharmaceuticals, Inc. ("Lupin"), Upsher-Smith, Wockhardt, Mylan Pharmaceuticals, Inc. ("Mylan"), Genpharm ULC and Genpharm, L.P. (collectively "Genpharm"); Interpharm Holdings, Inc. and Interpharm, Inc. (collectively "Interpharm") (whose interests in the suit were soon to be acquired by a wholly owned subsidiary of Amneal); Ranbaxy Inc. and Ranbaxy Laboratories Limited (collectively "Ranbaxy"), and Dr. Reddy's, filed Abbreviated New Drug Applications ("ANDAs") with the FDA seeking to market AB-rated generic versions of Namenda IR. Each of the manufacturers filed a "Paragraph IV" certification, certifying that the Namenda IR patent was invalid or not infringed by their drugs.

11.     In early 2008, Forest and Merz began filing patent infringement lawsuits pursuant to the Hatch-Waxman Act against the above referenced generic competitors. Under the Hatch-Waxman Act, the mere filing of these patent infringement lawsuits prevented the FDA from approving the generic ANDAs for each of these generic manufacturers for 30-months, regardless of the merits of the lawsuits.

12.     Between July 2009 and July 2010, Forest and Merz ended the patent infringement litigation against the Generic Manufacturer Defendants and Orchid, Lupin, and Mylan by entering into anticompetitive settlement agreements.

13.     As alleged herein, at least five of the Generic Manufacturer Defendants agreed not to compete with each other or Forest until July 11, 2015.

14.     During the period of delay Forest secured from the anticompetitive agreements, Forest implemented what its CEO referred to as a "forced switch" or "hard switch" of the U.S. memantine hydrochloride market from Namenda IR to Namenda XR, a product that offered no material benefit to patients,[4] but which has longer patent protection and is not AB-rated to generic versions of Namenda IR.

15.     Forest carefully timed the launch of Namenda XR to avoid prematurely cannibalizing sales of Namenda IR, Forest's highest grossing product, yet still allowing sufficient time to force the memantine hydrochloride market to convert to Namenda XR prior to the launch of AB-rated generic versions of Namenda IR. Because the "forced switch" effectively removed Namenda IR from the market, as intended, and thereby significantly impeding automatic generic substitution at the pharmacy level (the most efficient means of generic pharmaceuticals to compete), when generic manufacturers launched their generic version of Namenda IR in July 2015, they were able to capture only a small fraction of the memantine hydrochloride market.

16.     But for the anticompetitive agreements, many of the Generic Manufacturer Defendants would have launched their generic products: (a) upon receiving FDA approval while the patent litigation was still pending (*i.e.* "at risk"); (b) upon prevailing against Forest in the underlying patent litigation; (c) via lawful, separate, and independent settlement agreements; or (d) at the very latest in April 2015 after expiration of the '703 patent.

---

[4]  No studies have been done to show that Namenda XR is more effective than Namenda IR. As the Second Circuit recently observed: "Namenda IR and Namenda XR have the same active ingredient and the same therapeutic effect." *State of New York v. Actavis, PLC*, 787 F.3d 638, 647 (2d Cir. May 22, 2015). The FDA concluded that "the efficacy, tolerability and safety profiles are expected to be similar …" NDA No. 22-525, Clinical Pharmacology and Biopharmaceutics Review(s), at p. 4 (available at http://www.accessdata.fda.gov/drugsatfda_docs/nda/2010/022525s000_namenda_xr_toc.cfm) (last accessed May 13, 2019).

17.     Similarly, but for the unlawful forced product switch from Namenda IR to Namenda XR, the Generic Manufacturer Defendants and other generics would have captured a much larger share of the memantine hydrochloride market than they have been able to capture with the belated launch of their products beginning in July 2015. The smaller available market share may have additionally caused some would-be generic challengers to abandon their efforts to market a generic version of Namenda IR altogether, thus compounding harm to competition. Plaintiffs Assignors' would have, in turn, substantially substituted the less-expensive generic versions of Namenda IR for their purchases of more-expensive Namenda IR, thus saving substantial sums of money.

18.     Defendants' conduct was designed to and did in fact: (a) delay the entry of less-expensive, AB-rated generic versions of Namenda IR; (b) fix, raise, maintain or stabilize the price of memantine hydrochloride; (c) allocate 100% of the U.S. market for memantine hydrochloride to Forest until 3 months after the expiration of the patent; and (d) substantially foreclose the most effective means of generic competition in order to preserve a greater share of that market after the belated launch of generic Namenda in July 2015.

19.     Forest's monopoly power in the memantine hydrochloride market was maintained through willful exclusionary conduct, as distinguished from growth or development because of a legally obtained valid patent, other legally obtained market exclusivity, a superior product, business acumen, or historical accident.

20.     As a direct and proximate result of Defendants' unlawful conduct alleged herein, Plaintiffs' Assignors have been injured in their business or property. Their injury consists of paying higher prices for memantine hydrochloride products than they would have paid absent these

violations. This injury is the type the antitrust, consumer protection, and unjust enrichment laws were designed to prevent and flows from that which makes Defendants' conduct unlawful.

## JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a) as the amount in controversy exceeds $75,000.00, exclusive of interest and costs, and Plaintiffs are completely diverse from Defendants. This Court also has supplemental jurisdiction under 28 U.S.C. § 1367.

22.     This Court has personal jurisdiction because each Defendant has transacted business, maintained substantial contacts, and committed overt acts in furtherance of the illegal scheme and conspiracy alleged herein throughout the United States, including in this District. The scheme and conspiracy have been directed at, and have had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

23.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 (b), (c), and (d) because at all times material hereto, Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of the alleged activity affecting trade and commerce discussed below, has been carried out in this District.

24.     Defendants' conduct alleged herein occurred within the flow of interstate commerce, including in this District, and was intended to and did have a direct and substantial effect upon such commerce.

25.     Defendants' manufactured, sold and shipped Namenda in a continuous and uninterrupted flow of interstate commerce. Defendants' anticompetitive conduct has a direct, substantial, and reasonably foreseeable effect on interstate commerce.

## PARTIES

26.     Plaintiff MSP Recovery Claims, Series LLC is a Delaware series limited liability company with its principal place of business at 2701 S. LeJeune Rd., 10th Floor, Coral Gables, Florida 33134. One or more MA Plans irrevocably assigned to this Plaintiff the right to assert the causes of action alleged in this Complaint. Because of the assignment or assignments, Plaintiff is empowered to recover the cost of Namenda payments made on behalf of the Assignors' beneficiaries for which Defendants are liable.[5]

27.     Plaintiff MSPA Claims 1, LLC is a Florida limited liability company with its principal place of business at 2701 S. LeJeune Rd. 10th Floor, Coral Gables, Florida 33134. Because of the assignment or assignments, Plaintiff is empowered to recover the cost of Namenda payments made on behalf of the Assignors' beneficiaries for which Defendants are liable.

28.     Plaintiffs' members are citizens of Florida and Texas.

29.     Plaintiffs' Assignors provide health benefits to their enrollees, who reside in numerous locations in the United States. As third-party payers of pharmaceutical claims for their enrollees, Plaintiffs' Assignors are end-payers of Namenda and were thereby injured as a result of Defendants' unlawful behavior. Plaintiffs' analysis of their Assignors' data confirms that Plaintiffs have indirectly purchased and/or provided reimbursement for Namenda during the relevant time period for purchases of Namenda in Alabama, Arizona, California, District of Columbia, Florida, Illinois, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, Oregon, Puerto Rico, Rhode

---

[5] Plaintiff MSP Recovery Claims, Series LLC has established various specific Series for which it is the exclusive owner. The specific Series identify the Assignors assigning to Plaintiff. All specific Series form a part of Plaintiff and are owned by Plaintiff. Plaintiff owns and controls any and all Series' interest and all claims and rights transferred from any Assignor and seeks relief for each Assignor who made payments for Namenda for which Defendants are liable.

Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia and Wisconsin. When a generic version of a prescription drug is available, Plaintiffs' Assignors enrollees – and Plaintiffs' Assignors – typically purchase and/or provide reimbursement for the generic version.

30.     Defendant Forest Laboratories, LLC, f/k/a Forest Laboratories, Inc. is a Delaware limited liability company with its principal place of business at 909 Third Avenue, New York, New York. Upon information and belief, Forest Laboratories, LLC's sole member, is a citizen of Delaware. Forest Laboratories, LLC is a company engaged in the development, marketing, and distribution of brand-name pharmaceutical products. On July 1, 2014, Forest Laboratories, LLC was acquired by, and became a wholly owned subsidiary of Actavis plc.

31.     Defendant Allergan plc f/k/a as Actavis plc, is an Irish public limited company with its principal place of business at Clonshaugh Business and Technology Park Coolock, Dublin, D17 E400, Ireland. Actavis plc acquired Forest Laboratories, LLC on July 1, 2014. On June 15, 2015, Actavis plc changed its name to Allergan plc. Allergan plc markets a broad portfolio of brand-name and generic pharmaceuticals and has commercial operations in more than sixty countries around the world.

32.     Defendants Forest Laboratories, LLC and Allergan plc (including its successor-in-interest Actavis plc) are collectively referred to herein as "Forest."

33.     Defendant Merz GmbH & Co. KgaA is a German corporation with its principal place of business at Eckenheimer Landstrasse 100, D-60318 Frankfurt am Main, Germany. Merz GmbH & Co. KgaA is a company engaged in the development, production, and distribution of brand-name pharmaceutical products.

34.     Defendant Merz Pharma GmbH & Co. KgaA is a German corporation with its principal place of business at Eckenheimer Landstrasse 100, D-60318 Frankfurt am Main, Germany.

35.     Defendant Merz Pharmaceuticals GmbH is a German corporation with its principal place of business at Eckenheimer Landstrasse 100, D-60318 Frankfurt am Main, Germany.

36.     Defendants Merz GmbH & Co. KgaA, Merz Pharma GmbH & Co. KgaA, and Merz Pharmaceuticals GmbH are collectively referred to herein as "Merz."

37.     Defendant Barr Pharmaceuticals, LLC f/k/a Barr Pharmaceuticals, Inc. ("Barr") is a Delaware limited liability company with its principal place of business at 400 Chestnut Ridge Road, Woodcliff Lake, New Jersey 07677.[6] Barr is a wholly owned subsidiary of Teva Pharmaceutical Industries, Ltd.

38.     Defendant Teva Pharmaceuticals USA, Inc. is a Delaware corporation with its principal place of business at 1090 Harsham Road, North Wales, Pennsylvania 19454. Teva Pharmaceuticals USA, Inc. is a wholly owned subsidiary of Teva Pharmaceutical Industries, Ltd.

39.     Defendant Teva Pharmaceutical Industries, Ltd. is an Israeli corporation with its principal place of business at 5 Basel Street, Petach Tikva, Israel.

40.     Defendants Teva Pharmaceuticals USA, Inc. and Teva Pharmaceutical Industries, Ltd. are collectively referred to herein as "Teva."

41.     Defendant Amneal Pharmaceuticals, LLC ("Amneal") is a Delaware limited liability corporation with its principal place of business at 400 Crossing Boulevard, Bridgewater,

---

[6] Plaintiffs conducted a diligent investigation but were unable to identify Barr's members and their citizenship.

New Jersey 08807.[7] In April 2008, Amneal, through its wholly owned subsidiary, Amneal Pharmaceuticals of New York, LLC, acquired the assets, facilities, and business of Interpharm Holdings, Inc. and Interpharm, Inc., including all assets relating to its generic memantine hydrochloride product.

42.     Defendant Cobalt Laboratories, LLC f/k/a Cobalt Laboratories, Inc. ("Cobalt") is a Delaware limited liability company with its principal place of business at 24840 Tamiami Trail, Bonita Springs, Florida 34134. Upon information and belief, Cobalt's sole member is Watson Laboratories, Inc., a Nevada corporation with its principal place of business at 400 Interpace Parkway, Parsippany, New Jersey 07054. Cobalt is an indirect wholly owned subsidiary of Allergan plc.

43.     Defendant Upsher-Smith Laboratories, Inc. ("Upsher-Smith") is a Minnesota corporation with its principal place of business at 6701 Evenstad Drive, Maple Grove, Minnesota 55369.

44.     Defendant Wockhardt Limited is an Indian corporation with its principal place of business at Wockhardt Towers, Bandra Kurla Complex, Bandra (East), Mumbai, 400051, India.

45.     Defendant Wockhardt USA LLC is a Delaware limited liability company with its principal place of business at 20 Waterview Boulevard, Parsippany, New Jersey 07054.[8] Wockhardt USA LLC is ultimately owned by Wockhardt Bio AG. Wockhardt Bio AG is partially owned by Wockhardt Limited.

---

[7] Plaintiffs conducted a diligent investigation but were unable to identify Amneal's members and their citizenship.

[8] Plaintiffs conducted a diligent investigation but were unable to identify Wockhardt's members and their citizenship.

46.    Defendants Wockhardt Limited and Wockhardt USA LLC are collectively referred to herein as "Wockhardt."

47.    Defendant Sun Pharmaceuticals Industries, Ltd. ("Sun") is an Indian company with its principal place of business at Acme Plaza, Andheri-Kurla Rd., Andheri (E), Mumbai – 400-059, India.

48.    Defendant Dr. Reddy's Laboratories Ltd. is an Indian company with its principal place of business at 8-2-337, Road 3, Banjara Hills, Hyderabad, Telangana – 500-034, India.

49.    Defendant Dr. Reddy's Laboratories Inc. is a New Jersey corporation with its principal place of business at 107 College Road East, Princeton, New Jersey 08540. Dr. Reddy's Laboratories Inc. is a wholly owned subsidiary of Dr. Reddy's Laboratories Ltd.

50.    Defendants Dr. Reddy's Laboratories Ltd. and Dr. Reddy's Laboratories Inc. are collectively referred to herein as "Dr. Reddy's."

## STANDING

51.    Plaintiffs' Assignors administer Medicare benefits for Medicare beneficiaries under Medicare Part C and Part D; whether said rights arise from (i) contractual agreements, such as participation and network agreements with capitation and risk sharing arrangements, and/or (ii) state and federal laws that provide for the reimbursement of payments made by the Assignor health plans, including the right to recover claims for health care services on a fee-for-service basis.

52.    Although Plaintiffs seek recovery on behalf of each and every one of its Assignors who paid inflated prices for Namenda, one representative assignment for each Plaintiff is alleged in detail in the Appendix to establish standing.[9] The assignments are valid and binding contracts.

---

[9] At the time of filing the additional Assignors include: 7th Avenue Medical Plaza, Inc., Accountable Care Options, LLC, Alianza Profesional de Cuidado Medico, Inc., Arse, Inc., Broward Primary Partners, LLC, Centro Medico de Salinas, Inc., Choice One Medical Group,

A copy of each representative assignment is attached hereto as Exhibits A-B and are explained in more detail in the Appendix.

53.     At all material times hereto, one or more of Plaintiffs' Assignors provided Medicare benefits to their enrollees, including payments for the enrollees' Namenda prescriptions. Attached hereto as Exhibit C is a non-exhaustive list of instances wherein Plaintiffs' Assignors paid for Namenda prescriptions for their enrollees from 2006 to 2019. An explanation of the column headers in Exhibit C is as follows:

      a.  "MSP Mrd ID" is the unique internal code Plaintiffs use in the place of a patient's name to comply with HIPAA;

      b.  "MSP Member ID" is the code Plaintiffs use to identify which assignor made the payment. For example, of the representative assignors identified in this Complaint, the MSP Member ID for Interamerican Medical Center Group, LLC include IMC-COV, IMC-MED, IMC-PRE, IMC-SIM, and IMC-WELL; and SummaCare's MSP Member ID is SMCR;

      c.  "MSP DOS" is the date of service;

      d.  "MSP Paid Amount Value" is the paid amount value provided by the Assignor; "MSP Billed Amount Value" is the billed amount value provided by the Assignor. This column has zeros because the Assignor did not

---

LLC, Clinica Las Mercedes, Inc., ConnectiCare, Inc., Corporacion Medica Oriental, Corp., EmblemHealth Services Company, LLC (and affiliated companies), Family Medicine Group, Inc., Family Physicians of Winter Park P.A. d/b/a Family Physicians Group, Florida Healthcare Plus, Inc., Grupo Cuidado Geriatrico Integral, Inc., Health Care Advisor Services, Inc., Health First Health Plans, Inc., Healthcare Alliance Group, Inc., Hygea Health Holdings, Inc., Medical Consultants Management, LLC, Medical IPA of the Palm Beaches, Inc., Med-Caribe CSP a/k/a Medico-Caribe CSP, Inc., Millennium Medical Health Group, Inc., Palm Beach Primary Care Associates, Inc., Physician Assess Urgent Care Group, LLC, Physician H.M.O. Inc., Policlinica General de Coamo, Inc., Policlinica Medicas Asociadas, Inc., Ponce Advance Medical Group, P.S.C., Preferred Primary Care, LLC, Premier Care Partners, LLC, Primary Physicians Medical Service, LLC, Professional Health Choice, Inc., Quality Medical Care, Inc., Risk Watchers, Inc., SE Primary Care Services, CSP, Southern Healthcare Group, Inc., Suncoast Medical Network 2, Inc., Suncoast Provider Network, Inc., Transatlantic Healthcare, LLC, University Health Care MSO, Inc., Verimed IPA, LLC. The assignment agreements will be produced in discovery upon entry an appropriate confidentiality order.

maintain such information or did not provide Plaintiffs with this information;

e. "NPI Source" is the standard unique health identifier for health care providers adopted by the Secretary of Health and Human Services in accordance with HIPAA. All covered entities are required by regulation to use NPIs to identify health care providers. NPI information is publicly available through NPPES NPI Registry maintained by the Centers for Medicare and Medicaid Services ("CMS");

f. "City" and "state" are the primary practice addresses associated with the NPI number. This information is sourced by NPPES NPI Registry;

g. "Selected taxonomy code" is the selected taxonomy code as reflected by the NPPES NPI Registry; "Selected taxonomy description" is the selected taxonomy description as reflected on the NPPES NPI Registry;

h. "Selected taxonomy description" is the selected taxonomy description as reflected on the NPPES NPI Registry.

54.     Plaintiffs' Assignors provided payment for their enrollees' prescribed Namenda prescriptions throughout the United States, including in the state of New York.

## REGULATORY FRAMEWORK

### I.     Medicare Prescription Drug Benefits

55.     Plaintiffs are assignees of Medicare Part C and Part D prescription drug coverage providers (MA Plans and related entities) that provide benefits to thousands of individual beneficiaries.

56.     The Medicare Act functions as a "federally funded health insurance program for the elderly and the disabled."[10]

57.     The Medicare Act consists of five parts—Parts A, B, C, D and E.

---

[10] *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 506 (1993).

58.     Parts A and B "create, describe, and regulate traditional fee-for-service, government-administered Medicare."[11]

59.     Part C outlines the Medicare Advantage program and provides that Medicare beneficiaries may elect for private insurers to provide their Medicare benefits. 42 U.S.C. §§ 1395w-21-29.

60.     Part D provides prescription drug coverage to Medicare beneficiaries, and Part E contains miscellaneous provisions related to 42 U.S.C. §§ 1395x, 1395y.

61.     An enrollee's health coverage with an MA Plan is strictly construed and regulated by CMS.

62.     Medicare does not directly offer prescription drug coverage to its beneficiaries. Instead, prescription drug coverage is an optional benefit provided by insurance companies and other private companies approved by CMS.

63.     Medicare beneficiaries have two options for obtaining Part D prescription drug coverage: (1) through an MA Plan that offers Part C benefits as well as prescription coverage; or (2) through a separate Medicare Prescription Drug Plan.

64.     Generally, MA Plans that offer Part C benefits include prescription drug benefits.

65.     Plans that provide Part D coverage must provide qualified prescription drug coverage which includes "standard prescription drug coverage" or "alternative prescription drug coverage" with at least actuarially equivalent benefits.

---

[11] *In re Avandia Mktg. Sales Practices and Prod. Liab. Litig.*, 685 F.3d 353, 357 (3d Cir. 2012) (citing 42 U.S.C. §§ 1395c to 1395i-5; 1395j to 1395w).

66.    Part D has different stages of cost sharing until a beneficiary reaches a set limit on out-of-pocket costs for the year. For 2019, the limit on out-of-pocket costs is $5,100.00.[12] After that, the MA Plan pays most of the costs for the drug throughout the remainder of the year.

67.    MA Plans may require a deductible be met prior to paying for drug coverage. In 2019, the maximum deductible a beneficiary can be charged is $415.00.[13] During the deductible stage, the beneficiary pays all costs for their prescriptions.

68.    Once the deductible is met, the initial coverage period begins. During this period, the beneficiary pays a portion of the drug's cost and the MA Plan pays the remainder. The amount paid by the beneficiary will be either a copayment or coinsurance. A copayment is a set amount for all drugs based on what tier the drug falls into on the MA Plan's drug formulary (*e.g.*, $50 for brand-name drugs on tier 1, $25 for brand-name drugs on tier 2, $10 for generic drugs on tier 3). With coinsurance, a beneficiary will pay a percentage of the cost (*e.g.*, 25%) of the drug's cost.

69.    Most Part D plans have a coverage gap called the "Donut Hole" wherein there is a temporary limit on what the Part D plan will cover. The coverage gap begins after the beneficiary and MA Plan have paid a certain amount for covered drugs. In 2019, once the cost has reached $3,820.00 spent on prescriptions, a beneficiary will enter the Donut Hole.[14]

---

[12] *Catastrophic Coverage*, MEDICARE, https://www.medicare.gov/drug-coverage-part-d/costs-for-medicare-drug-coverage/catastrophic-coverage (last accessed May 13, 2019).

[13] *Yearly Deductible for Drug Plans*, MEDICARE, https://www.medicare.gov/drug-coverage-part-d/costs-for-medicare-drug-coverage/yearly-deductible-for-drug-plans (last accessed May 13, 2019).

[14] *Costs in the Coverage Gap*, MEDICARE, https://www.medicare.gov/drug-coverage-part-d/costs-for-medicare-drug-coverage/costs-in-the-coverage-gap (last accessed May 13, 2019).

70.    During the Donut Hole, the beneficiary pays 25% of the price for brand-name drugs and the MA Plan pays 75%. For generic drugs, the MA Plan pays 63% of the price and beneficiary pays 37%.[15]

71.    This percentage-of-cost requirement means that inflated brand-name drug prices hurt Part D sponsors in this third coverage phase.

72.    Once the beneficiary and MA Plan have spent $5,100.00, the beneficiary is out of the Donut Hole. Once out of the Donut Hole, the beneficiary automatically gets "catastrophic coverage." This means the beneficiary only pays their copayment or coinsurance amount for the rest of the year.

**Medicare Part D Coverage & Costs[16]**



---

[15] *Id.*

[16] *Part D Coverage & Costs,* MEDICARE MADE CLEAR BY UNITEDHEALTHCARE (May 8, 2018), *available at* https://www.medicaremadeclear.com/basics/medicare-coverage-and-costs/medicare-part-d (last accessed May 13, 2019).

## II.      The Federal Food, Drug, and Cosmetic Act ("FDCA")

73.      The FDCA, 21 U.S.C. § 301 *et seq*., governs the manufacture, sale, and marketing of pharmaceuticals in the United States. Pursuant to the FDCA, a pharmaceutical company seeking to bring a new drug to market must submit an NDA with the FDA, providing scientific data demonstrating that the drug is safe and effective for its intended use. 21 U.S.C. § 355(b)(1). The NDA must also include information regarding any applicable patents, including the patent expiration date. 21 U.S.C. § 355(b)(1). The testing and approval process for new drugs is generally "long, comprehensive, and costly."[17]

74.      After approval by the FDA, a manufacturer may list the new drug in the "Approved Drug Products with Therapeutic Equivalence Evaluations" (commonly referred to as the "Orange Book"). The Orange Book lists any patents: (i) that the brand-name manufacturer claims for an approved drug or its approved uses; and (ii) for which "a claim of patent infringement could reasonably be asserted if a person not licensed by the owner engaged in the manufacture, use, or sale of the drug." 21 U.S.C. § 355(b)(1); 21 U.S.C. § 355(j)(7)(A)(iii). The manufacturer may list in the Orange Book within 30 days of issuance of any patents issued after FDA approval of the NDA. 21 U.S.C. §§ 355(b)(1) and (c)(2).

75.      Once approved, a patented drug enjoys a period of market exclusivity. However, that period ends when the patent expires, and low-cost generic versions of the drug can enter the market and compete with the brand-name drug. This is referred to as going off the "patent-cliff."

## III.      The Hatch-Waxman Act

76.      In 1984, Congress enacted the Drug Price Competition and Patent Term Restoration Act (the "Hatch-Waxman Act"), Pub. L. No. 98-417, 98 Stat. 1585 (1984), which was intended to

---

[17] *FTC v. Actavis, Inc.*, 570 U.S. 756, 133 S. Ct. 2223, 2228 (2013).

encourage and facilitate competition from lower-priced generic drugs (which would reduce healthcare costs), while also providing further incentives for pharmaceutical companies to invest in new drug development (by allowing for extensions to market exclusivity).

77.    The Hatch-Waxman Act provides brand-name drug manufacturers with two methods to extend their period of market exclusivity beyond the standard 20-year patent term. First, a manufacturer may seek an extension of its patent from the United States Patent & Trademark Office ("USPTO") to account for the time it spent getting FDA approval. 35 U.S.C. § 156. This extension cannot exceed 5 years. *Id.* § 156(g)(6). Second, a manufacturer may obtain a 6-month period of pediatric exclusivity if it conducts certain pediatric studies and the FDA determines the use of the drug in children may produce health benefits. 21 U.S.C. § 355a. However, a grant of pediatric exclusivity does not extend the length of the patent but can operate to exclude generic competition by delaying the date by which the FDA may approve generics for sale.

78.    Under the Hatch-Waxman Act, a manufacturer of a generic version of the FDA approved brand-name drug may file an ANDA, which allows the generic manufacturer to rely upon the studies submitted by the brand-name manufacturer in connection with the original NDA to prove that the generic version of the drug is safe and effective.

79.    The ANDA application must provide information asserting that the following are true as to the generic drug: (1) the conditions of use prescribed, recommended, or suggested in the labeling for the generic drug have been previously approved for the brand-name drug; (2) the active ingredients are the same in the generic drug as in the brand-name drug; (3) the route of administration, dosage form, and strength of the generic drug are the same as the brand-name drug;

(4) the generic drug is bioequivalent[18] to the brand-name drug, the active ingredients are of the same pharmacological or therapeutic class, the generic drug can be expected to have the same therapeutic effect as the brand-name drug; and (5) the proposed labeling for the generic drug is the same as the labeling for the brand-name drug. 21 U.S.C. §§ 355(j)(2)(A)(i)-(v).

A.      ANDA Paragraph IV Certification

80.      A generic drug manufacturer's ANDA application must also certify one of four things: (1) that the brand-name drug is not patented ("Paragraph I certification"); (2) that the brand-name drug's patent has expired ("Paragraph II certification"); (3) that the brand-name drug's patent will expire prior to the manufacture of the generic drug ("Par agraph III certification"); or (4) that the brand-name drug's patent is invalid or will not be infringed by manufacture of the generic drug ("Paragraph IV certification"). 21 U.S.C. § 355(j)(2)(A)(vii)(I)-(IV).

81.      If a generic manufacturer files a Paragraph IV certification it must promptly give notice to the brand-name manufacturer. 21 U.S.C. § 355(j)(2)(B). The Hatch-Waxman Act provides that a Paragraph IV certification is treated as an act of patent infringement and gives the patent holder the right to sue the prospective generic manufacturer within 45 days of being notified of the filing of the Paragraph IV certification. *Id.* § 355(j)(5)(B)(iii). If the brand-name manufacturer brings suit within the 45 day time period, the FDA will not grant approval of the ANDA until the earlier of (a) the passage of 30 months from the date of receipt of the Paragraph IV notice, or (b) the issuance of a decision by a court that the patent is invalid or not infringed by the generic manufacturer's ANDA. *Id.* 355(j)(5)(B)(iv). Until one of these conditions occurs, the FDA may

---

[18] A drug is "bioequivalent" if the rate and extent of absorption of the drug do not show a significant difference. 21 U.S.C. § 355(j)(8)(B)(i). In other words, a generic drug is bioequivalent to a brand-name drug if it delivers the same amount of the same active ingredient to the patient's blood stream over the same amount of time.

grant "tentative approval," but cannot authorize the generic manufacturer to market its product (*i.e.* grant final approval). *Id.* The FDA may grant a tentative approval when it determines the ANDA would otherwise be ready for final approval but for the 30-month stay. If the brand-name manufacturer fails to bring suit during the 45-day period, the FDA's approval of the ANDA will become effective immediately. *Id.* 355(j)(5)(B)(iii).

82.     If a brand-name manufacturer has obtained pediatric exclusivity, the FDA may not approve any new ANDAs during the 6-month period. 21 U.S.C. § 355a. The statute does not provide for automatic revocation of any already-approved ANDAs. *Id.* § 355a(c)(1)(B)(ii). However, if there is a pending Paragraph IV certification, the 6-month pediatric exclusivity period only attaches if, "in the patent infringement litigation resulting from the certification [,] the court determines that the patent is valid and would be infringed." *Id.*

## B.      First-Filer's 180-Day Exclusivity Period

83.     The Hatch-Waxman Act grants the first manufacturer to file an ANDA with a Paragraph IV certification a 180-day exclusive marketing period for its generic drug, during which the FDA cannot grant approval to any other generic manufacturer's ANDA for the same brand-name drug. *Id.* § 355(j)(5)(B)(iv).

84.     The Supreme Court has recognized that "this 180 day period of exclusivity can prove valuable, possibly worth several hundred million dollars" to the first-filer.[19]

85.     A first-filer that informs the FDA that it intends to wait until all Orange Book listed patents expire before marketing its product does not get a 180-day exclusivity period. Congress created this 180-day period to incentivize generic manufacturers to challenge weak or invalid patents, or to invent around such patents by creating non-infringing generics.

---

[19] *FTC v. Actavis, Inc.*, 570 U.S. at 2229.

**IV.    State Generic Substitution Laws**

86.    Another fundamental aspect of the legislative framework governing market entry by generic drugs is a comprehensive set of state generic substitution laws ("Drug Product Selection laws" or "DPS laws"). All fifty states and the District of Columbia have DPS laws, which either permit or require pharmacists to dispense a therapeutically equivalent, lower-cost generic drug in place of a brand-name drug unless the prescribing physician expressly directs that the prescription must be dispensed as written. This practice facilitates price competition at the pharmacy and results in dramatically reduced drug costs for patients and the health care system after generic entry, while still ensuring that patients receive the same therapeutic benefits.

87.    Indeed, both Congress and state legislatures have actively encouraged generic substitution because of their recognition that the economics of the pharmaceutical industry prevent generic manufacturers from simultaneously (a) engaging in the type of heavy promotion or "detailing" typically done by brand-name manufacturers, and (b) providing the enormous cost savings to purchasers and consumers generated by generic drugs.

88.    For example, New York's DPS law requires a pharmacist to substitute a less expensive drug containing the same active ingredients, dosage form, and strength as the drug prescribed. N.Y. Educ. Law § 6816 a(1).

89.    State DPS laws are a critical element in facilitating lower-cost generic competition. These laws permit effective price competition between brand-name and generic drugs at the pharmacy. If a pharmacists needs to contact the physician to ask permission to substitute a generic drug for the chemically-identical brand-name drug each time the pharmacist filled a prescription, that would significantly and unnecessarily increase the costs and time required for dispensing generic drugs and impede the use of cheaper generics.

90.     The price competition at the pharmacy that DPS laws facilitate is the primary mechanism by which generic drugs are able to compete and reach the market. Competition at the pharmacy is especially important due to the unique characteristics of pharmaceutical markets. Generic manufacturers take market share away from brand-name pharmaceuticals by making their generic drugs available at a discount. They do not engage in expensive marketing to physicians and patients as brand-name drug companies do. Significant marketing expenditures by a generic manufacturer would likely increase the price of that generic and would not necessarily lead to greater sales by the marketer because generic entry commoditizes the market. Thus, when there is more than one generic on the market, a generic manufacturer marketing its product to physicians or patients has no way to guarantee that, once the physician is convinced to write a prescription for the generic drug in question, that pharmacist will dispense the manufacturer's product rather than one manufactured by the generic manufacturer.

91.     Because it typically would not make economic sense for a generic manufacturer to market its drug to patients and doctors, the primary means by which generic manufacturers obtain sales is through price competition at the pharmacy, made possible through the application of DPS laws. Indeed, this is fundamental to the existing regulatory framework. For these reasons, among others, the Federal Trade Commission ("FTC") explained in a recent amicus brief that "[a]s a practical matter, if a generic cannot be substituted at the pharmacy counter, the economically meaningful market for the generic product disappears."[20]

---

[20] Brief for Federal Trade Commission as Amicus Curiae at 9, *Mylan Pharms., Inc. v. Warner Chilcott Pub. Co.,* No. 12-3824 (E.D.Pa. Nov. 21, 2012) ["hereinafter "FTC Mylan Amicus Brief"], *available at* http://www.ftc.gov/sites/default/files/documents/amicus_briefs/mylan-pharmaceuticals-inc.et-al.v.warner-chilcott-public-limited-company-et-al./121127doryxamicusbrief.pdf (last accessed May 21, 2019).

92.     All state DPS laws require the generic drug to be "therapeutically equivalent." Most states have adopted the FDA's definition of therapeutic equivalence and only allow substitutions if the FDA designates the generic as therapeutically equivalent in the Orange Book.

93.     The FDA only considers drugs therapeutically equivalent if they are pharmaceutical equivalents[21] and bioequivalence[22] has been shown and the drugs can be expected to have the same clinical effect and safety effect when administered to patients. Drugs that the FDA determine are therapeutically equivalent are deemed to be "AB-rated."

## V.     The Competitive Effects of AB-Rated Generic Competition

94.     The only material difference between generic "AB-rated" drugs and their brand-name counterparts is the price. On average generics are typically around 30% less expensive than their brand-name counterparts when there is a single generic competitor, and this discount typically increases to 50% to 80% (or more) when there are multiple generic competitors on the market for a given brand. Consequently, the launch of a generic drug usually results in significant cost savings for all drug purchasers.

95.     Once a generic equivalent becomes available, an event sometimes referred to as the "patent cliff" occurs whereby the brand-name manufacturer sees a significant drop in profits. Upon entry into the market, the generic quickly captures sales of the corresponding brand-name drug, often capturing 80% or more of the brand's sales within the first 6 months. In a recent study, the FTC found that on average, within a year of generic entry, generics had captured 90% of corresponding brand-name drug sales and (with multiple generics on the market) prices had

---

[21] Pharmaceutical equivalence means the generic and brand-name drugs have, among other things, the same active ingredients, route of administration, strength, and dosage form.

[22] The FDA considers two drugs to be bioequivalent when they display comparable bioavailability, *i.e.* the rate and extent to which an active ingredient is absorbed, is the same.

dropped 85%.[23] The brand-name manufacturer is then forced to either compete by drastically lowering its prices or accept lower sales.

96.     Once multiple generic competitors enter the market, the competitive process accelerates and multiple generic sellers typically compete vigorously with each other over price, driving prices down toward marginal manufacturing costs.[24]

97.     A similar study done by the FDA found that between 1999 and 2004, entry of a second generic reduces the average generic price to nearly half of the brand-name price, and entry of additional generics reduced prices to 20% of the brand-name price – in other words, an 80% discount.[25]

98.     According to a study commissioned by the Association for Accessible Medicines, generic drugs saved the U.S. healthcare system $253 billion in 2016 and the U.S. healthcare system has saved $1.67 trillion in the last decade.[26] Savings for Medicare totaled $77 billion in 2016, meaning Medicare enrollees saved an average $1,883.[27]

---

[23] *See* FTC, PAY-FOR-DELAY: HOW DRUG COMPANY PAY-OFFS COST CONSUMERS BILLIONS (Jan. 2010) ("FTC Pay-for-Delay Study"), *available at* https://www.ftc.gov/sites/default/files/documents/reports/pay-delay-how-drug-company-pay-offs-cost-consumers-billions-federal-trade-commission-staff-study/100112payfordelayrpt.pdf (last accessed May 13, 2019).

[24] *See e.g. Patricia Danzon & Li-Wei Chao, Does Regulation Drive Out Competition in Pharmaceutical Market?,* J.L. & ECON. (Oct. 2010); Tracy Regan, *Generic Entry and Price Competition in the Prescription Drug Market – 18 Years after the Waxman-Hatch Act* (Univ. of Miami, Dep't of Econ., Working Paper, Feb. 14, 2004); R. Frank, *The Ongoing Regulation of Generic Drugs,* NEW ENG. J. MED., v. 357, pp. 1993-96 & n.20 (Nov. 2007).

[25] FDA, GENERIC COMPETITION AND DRUG PRICES (Nov. 20, 2017), *available at* https://www.fda.gov/about-fda/center-drug-evaluation-and-research/generic-competition-and-drug-prices (last accessed May 13, 2019).

[26] Association for Accessible Medicines, GENERIC DRUG ACCESS & SAVINGS IN THE U.S. (2017), *available at* https://www.accessiblemeds.org/sites/default/files/2017-07/2017-AAM-Access-Savings-Report-2017-web2.pdf (last accessed May 13, 2019).

[27] *Id.*

99.     Generic competition allows third-party payers, like Plaintiffs' Assignors, to: (i) purchase generic versions of brand-name drugs at substantially lower prices; and/or (ii) purchase the brand-name drug at reduced prices.

100.     However, until there is a bioequivalent, AB-rated generic drug on the market, the brand-name manufacturer has no competition and can charge supracompetitive prices. Thus, brand-name manufacturers, such as Forest, have incentive to forestall generics entering the market by using anticompetitive schemes and tactics such as those alleged herein.

101.     As a result, competition from generic drugs is viewed by brand-name manufacturers as a grave threat to their bottom lines. After their market exclusivity ends, brand-name manufacturers, like Forest, will often seek ways to extend their monopoly for as long as possible, sometimes resorting to illegal means.

## VI.    Anticompetitive Tactics Used by Brand-Name Manufacturers to Stall Generic Competition

102.     Confronted with an imminent loss of profits at the patent cliff, brand-name manufacturers often resort to anticompetitive tactics to stall generic competition.

### A.     Product Hopping

103.     The threat of AB-rated generic competition creates a powerful incentive for brand-name manufacturers to protect their revenue streams. This incentive can prompt brand-name manufacturers to create new products or new versions of old products that have real medical benefits to patients. It may also drive brand-name manufacturers to seek to obstruct generic drug competition by making changes to existing products that offer patients little or, as here, no clinical advantages whatsoever, but are intended to interfere with the normal brand-to-generic competition contemplated and encouraged by the Hatch-Waxman Act and the state DPS laws.

27

104.    One-way brand-name manufacturers game the system is through a practice known as product hopping. Manufacturers will introduce another version of an already existing drug that is no safer and no more effective than the original versions (the "new" version is typically a minor, non-therapeutic reformulation), and switch the market to the "new" version thereby causing the conversion of prescriptions for the original drug to be written for the "new" version. The result is that, by the time generic versions of the original brand-name drug reach the market, there are few, if any, prescriptions being written for the original version. Because the generic version is not therapeutically equivalent to the "new" drug (*e.g.*, dosage form), pharmacies cannot substitute a low-cost generic version for the more expensive brand-name drug.

105.    Successful implementation of a product hopping strategy typically requires that patients be switched prior to generic entry. Accomplishing the switch at that time ensures that the generics have no chance to compete for those patients via the more efficient mechanisms that the state DPS laws provide. As the FTC explained recently: "[i]f the brand manufacturer reformulates its product before a generic receives FDA approval," then the generic manufacturer is unlikely to be able to make significant sales with a generic version of the original branded drug.[28] Instead, "the generic's only practical option is to go back to the drawing board and reformulate its own product to be bioequivalent to the brand reformulation and thus substitutable at the pharmacy."[29] Of course, even that strategy will not work if the new formulation is patent protected or if the brand-name manufacturer decides to implement yet another formulation.[30]

---

[28] FTC Mylan Amicus Brief at 10.

[29] *Id.*

[30] The barriers to entry by a generic manufacturer are high. Such companies must first formulate a non-infringing generic version of the brand-name drug; conduct bioequivalence studies and other studies needed to support the ANDA; file the ANDA and work with the FDA on any issues that arise regarding approval; either challenge relevant patents or wait for them to expire; wait for expiration of any applicable regulatory exclusivities; and invest in manufacturing facilities

106.    Importantly, once a brand-name manufacturer has successfully achieved a switch to a follow-on product, it can expect that most "switched" patients will not make a second switch back to the generic version of the original product (when the generic is released) (the "reverse commute"). There are several reasons why this is the case, all generally relating to the ineffectiveness and inefficiency of price competition by generics in the absence of the application of generic substitution laws. First, as explained above, it would not make business sense for generic manufacturers to engage in marketing efforts to encourage physicians and patients to switch patients prescriptions back to a generic version of the original drug — and doing so would undermine the feasibility of selling low cost generic drugs.

107.    Second, absent a specific request from a patient, physicians are unlikely to act on their own to switch the patient back. As explained by the FTC: "The physician - who selects the drug product but does not pay for it - has little incentive to consider price when deciding which drug to prescribe."[31]

108.    Third, while patients are concerned about price, they are frequently unaware that comparable, lower-cost generic drugs are on the market (and as noted, it is infeasible for generic manufacturers to market to them).

---

for commercialization of the product. It is not economically rational for generic manufacturers to engage in these costly activities until regulatory and patent exclusivity expirations near. This is all the more so when generic companies have already heavily invested in formulating and pursuing FDA approval of a generic version of a brand-name drug only to have the brand-name manufacturer make a therapeutically meaningless formulation change and switch the market to that new formulation for the anticompetitive purpose of thwarting meaningful competition from the existing generic product. This puts the generic manufacturer in the position of having to scrap its investment in the initial generic version of the drug and re-invest in developing a second generic product equivalent to the next version of the brand-name counterpart drug, all in the hopes that additional switches will not take place prior to approval and launch of the second generation generic product. *See, generally, Abbott Laboratories v. Teva Pharm. USA, Inc.*, 432 F. Supp. 2d 408 (D. Del. 2006).

[31] FTC Mylan Amicus Brief at 6.

109.    Finally, while insurers may be aware of competing generics and motivated to encourage switching, they face substantial challenges in doing so. Even when they engage in substantial efforts to encourage patients to switch, these efforts are frequently very costly, and may have limited success.

110.    There are various tactics by which a brand-name manufacturer will attempt to try and encourage physicians and patients to switch to its "new" version of the drug prior to generic entry. In what has been termed a "soft switch," a manufacturer will aggressively promote the "new" drug and stop marketing the original drug. The company will typically advocate to physicians that the new product is superior and should be prescribed instead of the original.

111.    In what has been termed a "hard switch" or "forced switch," a manufacturer may force physicians and patients to switch to the new drug by (i) announcing the original product will be discontinued on a specified future date; (ii) restricting distribution and availability of the original drug; or (iii) taking the original drug off the market prior to the expiration of its patent term leaving patients with no other option but to switch.

112.    For a brand-name drug manufacturer seeking to implement a product hopping strategy by forcing patients to switch drugs, it is especially important that the brand-name drug manufacturer take action before a generic enters the market. Prior to generic entry, the brand-name manufacturer controls all drug sales for the original drug and can use the tactics described above effectively to move patients from one of its own drugs to another. But after generic entry, there will be effective price competition between the original brand-name drug and generic substitutes as a result of the application of DPS laws, and most of the patients taking the original drug will likely switch to the generic version. Once that happens, the brand-name manufacturer still has the opportunity to compete on the merits, that is, to market to patients and physicians to convince them

that the new, reformulated drug is worth the extra cost as compared to the generic. But the opportunities available to the brand-name manufacturer to manipulate prescribing physicians' practices become much more limited.

113.   After a product hop, generic manufacturers with AB-rated generic versions of the old brand formulation have very limited options for marketing their product, all of which result in significantly higher prices for purchasers, such as Plaintiffs' Assignors. Their options are to: (a) implement their own extensive sales and marketing campaign for their generic drug, which dramatically increases the price for the product (and, as a practical matter, acts as a barrier to meaningful market entry); (b) abandon altogether their generic product, meaning no generics are available; or (c) enter as a normal generic in a greatly and artificially diminished segment of the market resulting in dramatically lower sales and savings to purchasers.

## B.   Settlement Agreements

114.   Another anticompetitive tactic used by brand-name manufacturers to lessen the impact of generic competition is to enter into settlement agreements with multiple generic manufacturers that include "contingent launch" provisions, which provide assurance to the generic manufacturers that if they agree to delay launch until a widely-known, specific date, none of their generic competitors will come to market after.

115.   An anticompetitive agreement entered into between the brand-name manufacturer(s) and first-filer generic(s) often subjects later ANDA filers to the delayed entry date agreed to between the brand-name manufacturer and its conspiring first-filer generic.

116.   In the absence of an anticompetitive agreement between the brand-name manufacturer and the first-filers, the later ANDA filers have pro-competitive incentives. They are motivated to expend resources to challenge the brand-name manufacturer's patent (knowing that

the first-filer generic is also fighting a patent infringement suit) and to enter the market as early as possible.

117.    When an anticompetitive agreement with the first-filer is already in place, however, litigation becomes less attractive to later filers. The later generic manufacturers know that the first-filer is not leading the charge against the brand-name manufacturer's patent (and has sometimes stipulated to the validity or enforceability of the patents as part of an anticompetitive, reverse payment settlement). The later generics must bear the brunt of the litigation costs themselves, and, upon prevailing in the patent litigation, expect to face competition from at least the first-filer generics, and typically an authorized generic as well. The settlement(s) between a brand-name manufacturer and first-filer generic manufacturer(s) will often provide that, if a later generic filer launches its generic product before the delayed date agreed to by brand-name manufacturer and first-filer, the first-filer is permitted to launch then as well – greatly reducing the incentive the later filer would otherwise have to continue fighting to enter as soon as possible.

118.    Thus, some later generics decide to simply give in to, or even join, the conspiracy between the brand-name manufacturer and the first-filer generic and drop their challenges to the brand-name manufacturer's patents and stay off the market until after entry by the first-filer.

119.    Such agreements are fundamentally anticompetitive and are contrary to the goals of the Hatch-Waxman statutory scheme. In particular, they extend the brand-name manufacturer's monopoly profits by blocking access to more affordable generic drugs, forcing purchasers to buy the expensive brand-name drug instead.

120.    Here, the large number of potential first-filing generics created a situation where no single first-filing generic had expectations of the usual substantial revenues that first-filing generics typically enjoy during the exclusivity period and thereafter. As a result, each of the

potential first-filer generics was incentivized to beat the competing first-filer generics to market in order to maximize revenues and recover the expenses associated with the preparation and prosecution of their ANDAs, as well as costs incurred in Hatch-Waxman litigation with Forest and Merz. In this context, however, their interests would be better served by agreeing to delay launch in exchange for the elimination of any theoretical patent risk, but only if all other generics collectively did the same. Otherwise, each first-filer would face the potentially substantial economic detriment of being sidelined while other generics entered the market and exploited the lucrative first-filer advantage.

## **FACTUAL ALLEGATIONS**

### I. **Alzheimer's Disease and Namenda**

121.    Alzheimer's disease is a devastating neurodegenerative disorder affecting over 5 million Americans and is the sixth leading cause of death in the United States. As the population continues to live longer, the number of people living with Alzheimer's is expected to triple by 2050.  Patients with Alzheimer's progressively deteriorate, with worsening symptoms, until death. While the symptoms of Alzheimer's vary from patient to patient, common early symptoms include short-term memory loss, difficulty performing familiar tasks, disorientation, trouble with language, and mood swings. Patients with more severe Alzheimer's may be unable to walk or unable to recognize and communicate with family members and friends. As the disease progresses, patients are unable to function independently, and become more and more dependent on caregivers.

122.    Currently, there is no cure for Alzheimer's. Patients and their loved ones depend on a handful of medications approved to treat the disease, hoping that the medications may be able to temporarily alleviate some symptoms or slow down the progression of others.

123.    Memantine hydrochloride, branded and marketed by Forest as Namenda in the United States, is a N-Methyl-D-Aspartate ("NMDA") receptor antagonist. Namenda works to prevent the overstimulation of glutamate, an amino acid that excites nerves, and in excess, is a powerful nerve-cell killer. At all times relevant to this Complaint, Namenda is the only NMDA antagonist approved by the FDA for treatment of Alzheimer's in the United States and has been approved for use in patients with moderate and severe Alzheimer's disease.

124.    Memantine hydrochloride has been on the market in Germany since the 1990s for the treatment of dementia, among other things.

125.    On or about June 2000, Merz and Forest entered into a license and cooperation agreement for the development of memantine in the treatment of Alzheimer's. As part of the agreement, Forest obtained the exclusive rights to market a memantine hydrochloride product in the United States under Merz's '703 patent.

126.    In December 2002, Forest submitted an NDA to the FDA seeking approval to market memantine hydrochloride tablets (5 mg, 10 mg, 15 mg, and 20 mg) – branded as Namenda – for the treatment of moderate to severe Alzheimer's.

127.    Forest listed the '703 patent in the Orange Book, which identifies and provides information regarding the patent covering FDA-approved products. The '703 patent obtained by Merz in 1991 was set to expire on April 11, 2010.

128.    The FDA approved Forest's NDA for Namenda IR tablets on October 16, 2003 and Forest commercially launched the drug in the U.S. market in January 2004.

129.    Namenda IR became a very successful drug for Forest, with revenues, for example, of over $1.5 billion in 2013.

130.    Forest next took action to extend the life of the '703 patent by submitting an application to the United States Patent & Trademark Office ("USPTO") seeking a 5-year extension, the maximum under the Hatch-Waxman Act, for the time spent obtaining FDA approval for Namenda IR. The USPTO granted the 5-year extension in March 2009, extending the term of the '703 patent's expiration date from April 11, 2010 to April 11, 2015.

131.    In January 2014, Forest sought 6 months of pediatric exclusivity for Namenda IR from the FDA, based on studies regarding the use of memantine hydrochloride in pediatric patients with autism. The FDA granted Forest's request on June 18, 2014. As a result, the earliest date that a generic manufacturer who did not challenge the '703 patent (via a Paragraph IV certification) could come to market with an AB-rated equivalent was October 11, 2015.

## II.    Forest and Merz File Patent Infringement Suits Against Paragraph IV ANDA Filers

132.    Beginning in late 2007, at least 14 generic drug manufacturers filed ANDAs seeking to market generic versions of Namenda IR, contending via Paragraph IV certifications that the '703 patent was invalid and/or not infringed by their products.

133.    In January 2008, Forest and Merz timely brought patent infringement lawsuits in the United States District Court for the District of Delaware against Barr, Cobalt, Lupin, Teva, Orchid, Upsher-Smith and Wockhardt. By filing these lawsuits, Forest and Merz triggered an automatic 30-month stay pursuant to the Hatch-Waxman Act, continuing through mid-2010, during which time the FDA could not approve any of the aforementioned generic manufacturers' ANDAs for AB-rated equivalents to Namenda IR. These lawsuits were consolidated under lead case no. 08-cv-00021.

134.    In January 2008, Forest and Merz also brought patent infringement suits in the District of Delaware against Dr. Reddy's, Genpharm, Interpharm (for whom Amneal was later

substituted), Mylan, Ranbaxy, and Sun, triggering another automatic 30-month stay. These lawsuits were consolidated under lead case no. 08-cv-00052.

135.    On information and belief, Barr, Teva, Cobalt, Amneal, Upsher-Smith, Lupin, Mylan, Sun, Orchid, Dr. Reddy's and Wockhardt were all first to file substantially complete ANDAs with Paragraph IV certifications to the '703 patent. As a result, each would be entitled to 180 days of shared marketing exclusivity for generic Namenda, and any one of them could trigger the running of the 180-day exclusivity period by either launching a product or obtaining a judgment of invalidity or non-infringement of the '703 patent.

## III.    Generics Get Tentative Approval; Forest and Generic Manufacturers Enter Into Anticompetitive Agreements Prior to the Expiration of the 30-Month Stay

136.    On information and belief, the 30-month stays barring the FDA from final approval of the first-to-file generic's ANDAs would begin to expire in April 2010 (the expiration dates vary slightly from generic to generic because the stay commences for each generic on the date of Forest's receipt of that generic's Paragraph IV certification notice).

137.    Forest and Merz knew the Generic Manufacturer Defendants' defenses in the patent infringement case would be that the claims of the '703 patent were "anticipated" and "obvious" in view of the "prior art" and that Forest improperly sought and obtained a longer patent term extension than that to which it was entitled, among others, were strong. As such, litigation by any generic challenger through trial posed a significant risk of patent invalidation for Forest. In addition, one or more of the generic challengers advanced non-infringement defenses that posed additional risk to Forest.

138.    Forest and Merz would have to induce all the Generic Manufacturer Defendants to refrain from selling their generic versions of Namenda IR. A single generic version of Namenda

IR entering the market would cause the majority of memantine hydrochloride purchases to switch from Namenda IR to the substantially less-expansive generic version.

139.    The Generic Manufacturer Defendants were individually motivated to enter the market as quickly as possible. With the large and unprecedented number of potential first-filers, the Generic Manufacturer Defendants were particularly motivated to be the first to obtain FDA approval and launch in order to capitalize not only on being the exclusive generic on the market for an indefinite period, but also on the continuing benefits of having been first to establish supply relationships with large purchasers like major pharmacies and retail chains. Each of the Generic Manufacturer Defendants would have to receive something of immediate and substantial value (such as cash and/or protection from competition with each other) in order to induce them to forego their right to profit from the sale of their generic versions of Namenda IR.

140.    Forest and Merz settled with the following generic manufacturers on or about the following dates: July 2009 – Cobalt and Teva; September 2009 – Upsher-Smith, Wockhardt, Amneal, and Apotex Corp.; October 2009 – Sun; December 2009 – Lupin and Dr. Reddy's; April 2010 – Orchid; July 2010 – Mylan and several other generic ANDA filers.

141.    Pursuant to these agreements, Forest entered into licensing agreements with the Teva (including Barr, which had become a subsidiary of Teva), Amneal, Dr. Reddy's, Sun, Upsher-Smith, Watson, and Wockhardt whereby they agreed to delay competing against Forest until July 11, 2015, and none of the generic competitors would come to market earlier. As rational economic actors who filed ANDAs seeking early entry into the market, these generic manufacturers very likely received something of value in exchange for the agreement to delay entry. In exchange, certain Generic Manufacturer Defendants agreed to discontinue their efforts to

challenge the '703 patent and all of them agreed to refrain from launching their generic products until July 11, 2015.

142.    At the same time that these settlement agreements were consummated (or shortly thereafter), Forest and Merz settled their Hatch-Waxman infringement suits against any and all other potential first-filer generic manufacturers. On information and belief, Forest provided each of these generics with the same protections against competition from other generics through "contingent launch" provisions as well as other valuable consideration. In exchange, each settling generic agreed to discontinue their efforts to challenge the '703 patent and refrain from launching their generic products until the exact same day in Forest's settlement agreements with the Generic Manufacturer Defendants.

143.    On information and belief, each of the settlement agreements contains a provision extending the agreed generic launch date from January 11, 2015 to July 11, 2015 in the event that, subsequent to the consummation of the agreements, Forest was granted an additional 6-month pediatric exclusivity period.

144.    On information and belief, these settlements were negotiated collectively or, alternatively, were negotiated in a context where each of the settling Generic Manufacturer Defendants were informed of the pertinent provisions of the settlements with the other settling manufacturers, including the agreed upon launch date. In fact, some of the settlements with certain Generic Manufacturer Defendants and other generic manufacturers were signed on the same days in July 2009, September 2009, December 2009, and July 2010.

145.    In total, Forest settled approximately a dozen patent infringement lawsuits with generic competitors in the 1 year period leading up to the anticipated expiration date of the 30-

month stays in 2010.[32] By that time, all patent challenges brought by the Potential First-Filing Generics and other generic manufacturers seeking to market generic versions of Namenda IR tablets before the expiration of the '703 patent were settled and dismissed.

146.    Neither Forest, Merz, Generic Manufacturer Defendants, or other settling generic manufacturers have publicly disclosed the amount of the cash payments (or other valuable consideration) given by Forest and Merz to the Generic Manufacturer Defendants and other generic manufacturers pursuant to the settlement agreements. On information and belief, the value of Forest and Merz's aggregate payments to all potential first-filing generics, including the Generic Manufacturer Defendants, pursuant to the settlement agreements was millions of dollars.

147.    The settlement agreements were interdependent and anticompetitive in that each Generic Manufacturer Defendant and other potential first-filer generics would not have agreed to a July 11, 2015 entry date without the assurance that a generic competitor could not come to market earlier. None of the Generic Manufacturer Defendants and other potential first-filer generics would have agreed to delay entry for as long as they did (if at all) without similar agreements from all of their would-be generic competitors because: (1) they were all motivated to enter the market as soon as possible, and (2) they were motivated to avoid the economic detriment of being "stuck on the sidelines" while competing generics marketed their products. Thus, the contingent launch provisions were the mechanism to facilitate a coordinated or collusive agreement – the means by which individual market delay concessions were knit together in a network of related, horizontal

---

[32] *See* Forest's September 2009 Form 10Q filed with the United States Securities and Exchange Commission, p. 15-16 *available at* http://www.sec.gov/Archives/edgar/data/38074/000003807409000048/forest10qsep09.htm (last accessed May 15, 2019).; Market News, *Update 2 – Forest settles Alzheimer's drug patent suits* (July 22, 2010), *available at* https://www.reuters.com/article/mylan-forest/update-2-forest-settles-alzheimers-drug-patent-suits-idUSN2221752720100722 (last accessed May 15, 2019).

agreements among direct competitors. With that key provision in all of the settlement agreements, the Generic Manufacturer Defendants and other potential first-filer generics understood and were assured that each of them shared the same set of risks and rewards.

148.    In addition to being anticompetitive because they facilitated and/or coordinated collusive conduct between the Generic Manufacturer Defendants and other potential first-filer generics, the settlement agreements were independently unlawful and anticompetitive because the 6-month extension of the agreed launch date from January 11, 2015 to July 11, 2015 extended the agreements not to compete beyond the expiration of the '703 patent on April 11, 2015.

149.    An award of pediatric marketing exclusivity by the FDA does not extend or alter the expiration of any patent:

> A pediatric exclusivity period is granted by the FDA to NDA holders under 21 U.S.C. § 355a. In contrast, a patent term extension is granted by the PTO to patent owners. A pediatric exclusivity period is granted because the NDA holder performs and reports on tests that the FDA requests it to do. It provides that, for six months after the patent on the drug expires, it will not permit anyone else, subject to certain exceptions, to market the finished drug product described in the NDA … During the instant pediatric exclusivity period, others were free to make, sell, offer to sell, import and use the compounds claimed in the [patent at issue.] Pediatric exclusivity is a regulatory privilege; a patent term extension is a patent privilege.[33]

150.    "Pediatric exclusivity attaching to the end of a patent term is not a patent term extension under 35 U.S.C. 156. Rather, it extends the period during which the approval of an abbreviated new drug application (ANDA) … may not be made effective by FDA."[34]

151.    Under 21 U.S.C. § 355a(c)(1)(B)(ii), pediatric exclusivity, if and when it is granted, applies only on an ANDA-by-ANDA basis. It does not attach to the end of a patent for an ANDA

---

[33] *Altana Pharma AG v. Teva Pharms. USA, Inc.*, No. 04-2355, 2012 WL 2068611, *2 (D.N.J. June 7, 2012).

[34] Guidance for Industry: Qualifying for Pediatric Exclusivity Under Section 505A of the Federal Food, Drug and Cosmetic Act, U.S.F.D.A. (Revised, September 1999).

filer who maintains a Paragraph IV certification to the patent (unless the patent is found to be valid, enforceable, and/or infringed by that ANDA filer's proposed products).

152.    The Supreme Court held in *Brulotte v. Thys Co.*[35] that:

> [A]ny attempted reservation or continuation in the patentee or those claiming under him of the patent monopoly, after the patent expires, whatever the legal device employed, runs counter to the policy and purpose of the patent laws.[36]

153.    In 2015, the Supreme Court reaffirmed *Brulotte* and its progeny, holding that an agreement not to compete based upon an expired patent "would impermissibly undermine the patent laws":

> Allowing even a single company to restrict its use of an expired or invalid patent, we explained, would deprive the consuming public of the advantage to be derived from free exploitation of the discovery. And to permit such a result, whether or not authorized by express contract, would impermissibly undermine the patent laws.[37]

154.    Accordingly, it is black letter patent law that a patentee's attempt to restrict the use of the invention beyond the expiration of the patent would be unenforceable and unlawful *per se*.

155.    Here, on information and belief, all of the Generic Manufacturer Defendants and other potential first-filer generics, maintained Paragraph IV certifications to the '703 patent despite the settlement of the patent lawsuits with Forest and Merz. As a result, for all of the Generic Manufacturer Defendants and other potential first-filer generics, pediatric exclusivity did not attach to the '703 patent and, to the extent the settlement agreements prevented competition by the Generic Manufacturer Defendants and other potential first-filer generics after April 11, 2015, they were independently unlawful.

---

[35] 379 U.S. 29 (U.S. 1964)

[36] *Id.* at 31 (quoting *Scott Paper Co. v. Marcalus Co.*, 326 U.S. 249, 256 (1945).

[37] *Kimble v. Marvel Entm't, LLC*, 192 L. Ed. 2d 463, 469 (2015) (internal quotations and citations omitted).

156.    Had the Generic Manufacturer Defendants and other potential first-filer generics launched generic versions of Namenda IR upon receiving FDA final approval in 2010, or at the conclusion of the trials for patent infringement (as several of them were preparing and poised to do prior to the settlement agreements), or at the termination of Forest's patent rights on April 11, 2015, the generics would have rapidly driven down the price of memantine hydrochloride, creating a commoditized market with little or nothing to distinguish one generic from another (as happened in the weeks following generic launch in July 2015).[38] Price competition between generics is responsible for much of the dramatic price drop that accompanies generic entry.

157.    Absent Forest and Merz's unlawful contingent launch provisions under the settlement agreements, Forest, Merz, the Generic Manufacturer Defendants and other potential first-filer generics would have settled in a manner less restrictive of competition, resulting in much less delay of generic entry than has happened with the contingent launch provisions in place. Absent the anticompetitive settlement agreements, generic competition would have commenced sooner because one or more of the following events would have occurred: (1) the Generic Manufacturer Defendants and other potential first-filer generics would have prevailed in the patent litigation; (2) the Generic Manufacturer Defendants and other potential first-filer generics would have launched "at risk" prior to the resolution of the patent litigation; (3) Forest would have settled the litigation legally with an earlier generic entry date than July 11, 2015; or (4) the Generic Manufacturer Defendants and other potential first-filer generics would have launched immediately upon the expiration of the '703 Patent in April 2015.

---

[38] Prior to the end of July 2015, Amneal, Dr. Reddy's, Lupin, and Mylan had all launched their generic versions of Namenda IR. In addition, Defendant Allergan (formerly Actavis), successor in interest to Forest, had launched an authorized generic. With so many generics on the market, the price of generic Namenda IR tablets quickly plummeted to less than 10% of the July 2015 brand-name Namenda IR wholesale acquisition cost ("WAC").

158.    In January 2010, the FDA tentatively approved several generic ANDAs including those of Orchid, Lupin, Wockhardt, and Amneal (formerly Interpharm), meaning that those ANDAs were otherwise ready for approval, but could not receive final approval until the expiration of the 30-month stay. Thereafter, Teva received tentative approval in March 2010, followed by Mylan, Sun, and Upsher-Smith in April 2010.

159.    The Generic Manufacturer Defendants and other potential first-filer generics received final FDA approval on the following dates: Dr. Reddy's on April 14, 2010; Sun on May 5, 2010; Teva on October 25, 2011; Orchid on March 12, 2012; Amneal on April 10, 2015; Lupin on April 10, 2015; Mylan received tentative approval on April 2, 2010 and final approval on January 30, 2015; Upsher-Smith received tentative approval on April 15, 2010 and final approval on July 31, 2015.

### A.    Effects of the Settlement Agreements

160.    The settlement agreements made it possible for each Generic Manufacturer Defendant to ignore its own economic interest and agree to accept an entry date as late as 2015.

161.    The settlement agreements enabled Forest, Merz, and the Generic Manufacturer Defendants to: (i) delay entry of less expensive generic versions of Namenda IR 5 and 10 mg strengths in the United States; (ii) fix, raise, maintain or stabilize the price of Namenda IR and its generic equivalents; (iii) maintain a monopoly in the United States market for Namenda IR and its generic equivalents, and (iv) allocate the market for Namenda IR and its generic equivalents exclusively to Forest through July 11, 2015.

162.    The settlement agreements had the effect of delaying competition for memantine hydrochloride for as many as 5 to 6 years. But for these agreements, the Generic Manufacturer Defendants and other potential first-filer generics would have begun marketing and selling their

generics upon the receipt of final approval (or on an earlier date as provided for in the settlement agreements without anticompetitive provisions).

163.    In addition, Forest, Merz, and the Generic Manufacturer Defendants, knew and intended that their settlement agreements would block other, later-filing generic companies from launching their own generic versions of Namenda IR.

164.    As a result of the settlement agreements, no generic manufacturer launched a generic version of Namenda IR prior to July 11, 2015.

165.    The Generic Manufacturer Defendants and other potential first-filer generics represented all of the generics who would be entitled to market their generic versions of Namenda IR for 180 days free from competition from other generic versions of Namenda IR (other than an Authorized Generic ("AG").[39] The operation of the settlement agreements blocked any non-AG Namenda product from coming to the U.S. market until 180 days after the launch by one of the first-filing generics because the FDA will not approve subsequently filed ANDAs until the first-filers' exclusivity period has run.

166.    In other words, the settlement agreements served as a "cork in the bottle." So long as there was not a ruling invalidating the '703 patent or holding it not infringed (which would trigger the running of the first-filers' 180-day exclusivity period), the delayed launch of the first-filers' generic products called for under the settlement agreements prevented any generic other than the settling Generic Manufacturer Defendants and other potential first-filer generics from entering the market until 180 days after July 11, 2015.

---

[39] An authorized generic is a generic product licensed by the brand-name manufacturer and sold under the brand NDA.

167.    Thus, Defendants' settlement agreements have delayed or prevented the sale of generic Namenda IR in the United States for years, and unlawfully enabled Forest to sell Namenda IR at artificially inflated, supracompetitive prices.

## IV.    Forest Improperly Switched the Market from Namenda IR to Namenda XR – "Product Hop" Strategy

168.    With generic entry delayed by the settlement agreements, Forest transitioned to the next phase of its strategy to maintain its monopoly and minimize the effects of the patent cliff, the "product hop" strategy. In order to successfully retain substantial sales of Namenda after generics entered the market, Forest would need to (1) introduce (or identify) a follow-on product with a later patent expiration, and (2) successfully switch a large number of patients to the new product. And, for the reasons explained above (and further detailed below), Forest realized that it would need to achieve these goals prior to a generic version of Namenda IR entering the market.

169.    Forest developed two new follow-on drugs with patent expiration dates significantly later than Namenda IR. First, Forest reformulated Namenda as an extended-release capsule (Namenda XR) to be taken once-daily instead of twice-daily. Second, Forest worked to develop a fixed-dose-combination product that would include memantine and donepezil (the most commonly used AChEI). The patents claimed to cover Namenda XR until 2029, while the '703 patent for Namenda IR was set to expire in April 2015. The patents that cover the fixed-dose combination expire even later than the Namenda XR patents.

### A.    Forest Launched Namenda XR in June 2013 and Sought to Convert Patients from Namenda IR to Namenda XR – "The Soft Switch"

170.    On August 21, 2009, Forest submitted an NDA seeking to market Namenda XR. In support of the NDA, Forest submitted various studies supporting its claims of safety and efficacy for Namenda XR. In its NDA submission, Forest did not submit any head-to-head studies

comparing the safety and efficacy of Namenda XR to Namenda IR, nor did it otherwise indicate that Namenda XR was safer or more efficacious than Namenda IR.

171.   The FDA approved Namenda XR on or about June 21, 2010 but Forest did not launch the product until June 2013.

172.   Acknowledging the status of the Hatch-Waxman infringement suits against the Namenda IR generic competitors as a factor in the launch timing, Forest's Chief Operating Officer, Larry Olanoff, explained "We haven't said anything yet on that timing of launch; we're really taking it into consideration the marketplace, the impact of finalizing our own litigation activities around the immediate-release formulations as well as patents that are pending for the modified-release formulation."[40] While Forest initially emphasized that it was waiting on the USPTO to act on certain patent issues related to Namenda XR,[41] it stalled the launch over a year-and-a-half after those issues were resolved.[42]

173.   Although Namenda IR sales lagged in the fall of 2012, Forest still held off on launching the allegedly improved Namenda XR, despite having been ready and able to launch the product for years. Forest seemed to not even consider expediting the launch of Namenda XR:

> In long term care, however, sales are below expectations … [W]e are currently taking steps to shore up Namenda in long-term care. … And we continue to remain confident about the Alzheimer's market and the Namenda revenue stream over the next several years. We expect Namenda to continue to be an important product for us. The mid-calendar 2013 launch

---

[40] *See* Forest Laboratories F1Q11 Earnings Call Transcript, July 20, 2010, p. 9.

[41] According to Forest Chief Financial Officer, Francis Perrier, "[T]he XR strategy has been simmering in the background for some time now. Again, we're really waiting for the patent office to issue its complete published patent, which we hope will be soon." *See* Forest Laboratories F1Q12 Earnings Call Transcript, July 19, 2011, p. 10.

[42] On October 18, 2011, Francis Perrier announced that Forest "received notification today that the USPTO has issued a second method of treating Alzheimer's disease patent for Namenda XR … we currently anticipate launching Namenda XR in later 2012 or early 2013." *See* Forest Laboratories F2Q12 Earnings Call Transcript, October 18, 2011, p. 2.

of Namenda XR, a product that has a higher dose, a once-a-day formulation
… should propel future growth for the Namenda franchise.[43]

174.   Forest finally launched Namenda XR in 2013, 3 years after obtaining FDA approval. Forest delayed launch of the supposedly superior product in order to reap as much profit as possible from Namenda IR prior to launching Namenda XR. At the time Namenda XR was launched, Forest anticipated that generic Namenda IR products would enter the market in July 2015. The June 2013 launch would give Forest sufficient time before generic entry to persuade health plans and third-party payers, like Plaintiffs' Assignors, to put Namenda XR on a preferred formulary tier and start having patients switch to Namenda XR. If health plan coverage for Namenda IR and Namenda XR was equivalent, patients would be more likely to switch from Namenda IR to Namenda XR prior to generic entry.

175.   Crucially, Forest realized that for their product hop strategy to be successful, the switch to Namenda XR had to be before the cheaper generic versions of Namenda IR ("generic Namenda" or "generic memantine") hit the market. This is because once generic memantine became available, there would be price competition between the generic memantine and Namenda IR, and as a result many patients would be switched from Namenda IR to a less-expensive generic memantine.

176.   Forest knew that after generic memantine entered the market, convincing patients (or their physicians or health insurers) to switch to Namenda XR based on the merits of the drug would be difficult. Forest would need to convince them not to use a less-expensive generic drug and to instead pay significantly more (possibly 5 times more) for Namenda XR, essentially the same drug (with no greater safety or efficacy) just taken once-daily instead of twice-daily.

---

[43] Forest Chief Commercial Officer, Elaine Hochberg, Forest Laboratories F2Q13 Earnings Call Transcript, October 12, 2012, pp. 3-4.

177.    However, if Forest could manage to persuade patients, physicians, and health insurers, like Plaintiffs' Assignors, to switch to Namenda XR prior to generic entry, then Forest would be able to prevent generic manufacturers from engaging in effective price competition for these patients. This is because generic memantine would not be AB-rated to Namenda XR, and therefore a pharmacist could not substitute lower-priced generic memantine for Namenda XR under the state DPS laws. Rather, a pharmacist would have to obtain physician consent for the substitution, which is time consuming and costly. Similar limitations would be faced by health insurers or generic competitors that sought to convince a patient to switch back to Namenda IR. By ensuring that generic manufacturers could not engage in meaningful competition for the sales to the switched patients, Forest's strategy made it much more likely that Forest would be able to retain these sales once generic memantine became available.

178.    Forest knew that switching a large portion of the Namenda IR patient base to Namenda XR prior to generic entry would – by preventing the application of generic DPS laws – create significant practical barriers to generic competition that would allow Forest to retain a significantly higher portion of its Namenda franchise sales in the face of generic substitution than it otherwise would have.

179.    With the launch of Namenda XR in 2013, Forest stopped actively marketing Namenda IR and began an aggressive marketing campaign aimed at converting as many Namenda IR patients to Namenda XR as possible prior to July 2015 when the generics would enter the market.

180.    In connection with the launch of Namenda XR, Forest emphasized the importance of switching patients from Namenda IR to Namenda XR in internal documents, sales training, and public statements. For example, an executive made a speech at a Namenda XR launch event:

Our mission is to convert to Namenda XR and lift the franchise as a result of increased sales calls and combination therapy usage … Make no mistake about this, this is a sprint. We need to convert as much IR business to Namenda XR as quickly as possible.

Another executive wrote in a draft speech:

[T]he core of our brand strategy with XR is to convert our existing IR business to Namenda XR as fast as we can and also gain new starts for Namenda XR. We need to transition volume to XR to protect our Namenda revenue from generic penetration in 2015 when we lose IR patent exclusivity.[44]

181.     In June 2013, Forest's senior marketing executives considered two alternatives to the typical "soft switch" approach described above: completely discontinuing Namenda IR; or technically leaving the drug on the market, but severely restricting patient access through "limited distribution."[45]

182.     In a presentation attached to a June 26, 2013 email between two Forest executives, the author notes that, with respect to Forest's conversion strategy, "[e]ither [a withdrawal or limited distribution] approach is unprecedented … [w]e would be operating in uncharted territory." The presentation also notes that, "[p]rescribers patients, caregivers may be confused or dissatisfied with either withdrawal or limited distribution scenario and may choose to discontinue Namenda treatment."[46]

183.     Forest's pricing of Namenda XR confirms that its new formulation provided no material benefits over Namenda IR. Throughout the 2-year period that Namenda XR was on the market prior to generic launch in July 2015, Forest priced Namenda XR at a 5% discount off of

---

[44] *State of New York v. Actavis, PLC, et al.*, No. 1:14-07473, 2014 WL 7015198, at *17 (S.D.N.Y. Dec. 11, 2014) ("*Namenda I*").

[45] *Id.*

[46] *Id.*

the Namenda IR WAC price, confirming that the new formulation provided no material benefits over Namenda IR.

**B.      Dissatisfied with the Results of its Efforts to Switch Patients and Physicians Voluntarily to Namenda XR, Forest Hatches a Scheme to Force Them to Switch – the "Hard Switch"**

184.    As Forest sought to accomplish the soft switch from Namenda IR to XR, Forest executives were concerned that transparent strategies designed to influence patients' drug choices would be insufficient to convert a satisfactory number of patients prior to the entry of generic Namenda into the market. Forest's internal projections estimated that only 30% of Namenda IR users would voluntarily switch prior to July 2015.[47]

185.    There are several reasons why many patients and physicians were reluctant to switch from Namenda IR to Namenda XR. First, the benefits of a switch are illusory. There are no studies showing that Namenda XR is more effective than Namenda IR; and the reduction from taking twice-daily to once-daily is a hollow benefit for most patients, particularly those who are already taking multiple medications.[48]

186.    Second, Namenda XR has the exact same half-life (60 hours or more) as Namenda IR.[49] Prior to the launch of Namenda XR, physicians were aware that because of the lengthy half-life of Namenda IR, they could administer Namenda IR once-daily off-label in situations where reducing the patient's pill burden was desirable. The fact that Namenda XR's half-life is no greater

---

[47] *Schneiderman ex rel. New York v. Actavis PLC,* 787 F.3d 638, 648 (2d Cir. 2015) ("*Namenda II*").

[48] Most Alzheimer's patients are in long-term care facilities, where the average patient takes nine pills per day. Long-term care facilities generally dispense pills three times a day. *Namenda I*, 2014 WL 701598 at *19.

[49] A medication's half-life is how long it takes for half of it to be eliminated from the bloodstream.

than Namenda IR's half-life made it readily apparent to physicians that the new XR formulation provided no practical benefit over Namenda IR.

187.    Third, for many, if not most, patients (and their physicians), the benefits of the change of administration are outweighed by the risks of changing the medical routine of a highly vulnerable patient population. Given the potential risks to highly vulnerable later-phase Alzheimer's patients, without studies that show that a new medication has meaningful effects over a patient's current medication, physicians frequently will not switch a patient from a medicine on which the patient is doing well to a new product.

188.    If a choice were left to physicians and patients, a large number of them would stay on the original formulation. As a result, despite having employed aggressive marketing and pricing strategies typical of a "soft switch," few physicians and patients voluntarily converted from Namenda IR to Namenda XR.

189.    With a low conversion rate at or about 20% several months after the launch of Namenda XR, Forest became dissatisfied with the number of patients it would be able to switch through conventional strategies that relied on advocating the advantages of Namenda XR.

190.    Accordingly, Forest began to consider forcing physicians and patients to switch to Namenda XR. By at least as early as fall 2012, Forest began to consider a plan to discontinue (or drastically restrict distribution of) Namenda IR several months prior to the availability of generic memantine, in order to accomplish through a "hard switch" what it was unable to accomplish by providing favorable pricing and promoting Namenda XR on its own merits.

191.    On October 18, 2013, a Forest executive emailed his colleagues announcing the decision to withdraw Namenda IR from the market: "Dear all: Forest has made the decision to discontinue sales of Namenda IR and transition all patients to Namenda XR."[50]

192.    Forest predicted the profits from the "hard switch" would come largely from impeding generic competition. As noted above, the typical effect of AB-rated generic entry is a 90% shift of the brand-name market to generics within 1 year. Forest's hard switch was expected to transition 80 to 100% of Namenda IR patients to Namenda XR prior to generic entry, thereby impeding generic competition.[51]

193.    Forest's CEO, Brenton Saunders, testified that he made the decision, and by doing the hard switch, Forest had hoped to hold on to a large share of its base instead of losing it to competition.[52]

194.    During Forest's July 21, 2014 earnings call, Mr. Saunders unabashedly explained the motivation behind the hard switch strategy: "[I]f we do the hard switch and we've converted patients and caregivers to once-a-day therapy versus twice a day, it's very difficult for the generics then to reverse-commute[53] back, at least with existing Rxs. They don't have the sales force, they don't have the capabilities to do that. It doesn't mean that it can't happen, it just becomes very difficult. It is an obstacle that will allow us to, I think, again, go into a slow decline versus a complete cliff."[54]

---

[50] *Id*. at 17.

[51] *Namenda II*, 787 F.3d at at 654.

[52] *Namenda I*, 2014 WL 701598 at 17.

[53] A "reverse-commute" occurs when after a patient briefly switches from the original brand-name drug (*e.g.* Namenda IR) to the follow-on brand-name drug (*e.g.* Namenda XR), the patient will switch back to a generic version of the original brand-name drug.

[54] Forest Q3 2014 Earnings Call (Jan. 21, 2014).

195.     Similarly, another high-level Forest executive, considering the likelihood that patients converted to Namenda XR would switch back to Namenda IR, observed that "anyone converted to [Namenda XR] is likely to stay converted."[55]

196.     Forest knew that discontinuing or severely restricting the availability of Namenda IR would have serious consequences for patients. First, physicians' freedom to choose the medications they prefer for their patients would be eliminated or drastically curtailed. It would be Forest, rather than the patient or physician, that selects the patients' therapy. By discontinuing or limiting distribution of Namenda IR, Namenda XR became the only readily available FDA approved NMDA antagonist (aside from the rarely prescribed Namenda oral solution) on the market.

197.     Second, patients would be forced to undergo an unnecessary change in medication and dosage that could be disruptive to their routine. It is very difficult to predict how this change in routine can impact a patient. In addition, the recommended dosage for Namenda XR (28 mg) is significantly greater than the typical dosage for Namenda IR (two 10 mg tablets, for a total of 20 mg a day). This is why many physicians were reluctant to move their patients to Namenda XR and would not have done so if not forced by Forest.

198.     Forest also knew that widely publicizing the planned Namenda IR discontinuation would create an instant wave of conversion to Namenda XR because, among other reasons, physicians and health insurers would be compelled to act in advance of the actual discontinuation to ensure against any interruption in patient treatment.

---

[55] *See State of New York v. Actavis PLC,* Am. Compl., December 10, 2014, No. 1:14-07473 (S.D.N.Y.), ECF No. 70, at p. 28.

199.    Had Forest allowed Namenda IR to remain on the market until generic memantine became available, patients and physicians could have decided whether the benefits of switching to once-daily Namenda XR would outweigh the benefits of adhering to twice-daily therapy while using a less-expensive generic memantine. Moreover, had Forest kept Namenda IR on the market once generics were available, health insurers and third-party payers, like Plaintiffs' Assignors, could have decided whether to keep Namenda XR on a higher tier in their formularies or whether to include a generic memantine product on a higher tier. By removing Namenda IR from the market prior to generic memantine availability, Forest sought to deprive consumers, including Plaintiffs' Assignors, of that choice. Forest could avoid competing against low-cost generic memantine based on the merits of their redesigned drug by forcing Alzheimer's patients to take Namenda XR, with the knowledge that transaction costs would make the reverse-commute by patients from Namenda XR to a generic memantine highly unlikely.[56]

### 1. Forest Begins to Implement and then Modifies its "Hard Switch" Scheme

200.    On February 14, 2014, Forest issued a press release titled "Forest Labs., Inc., Forest Laboratories to Discontinue Namenda Tablets. Focus on Once-Daily Namenda XR," and announced that it planned to discontinue the sale of Namenda IR tablets effective August 15, 2014. The press release further indicated that the Namenda XR formulation (and the rarely prescribed oral solution) would still be available to consumers. On the same day, Forest notified the FDA of the discontinuation. Because a manufacturer does not simply withdraw a drug at once, absent pressing safety concerns, announcing the imminent discontinuation of a drug is tantamount to withdrawal.[57]

---

[56] *Namenda I*, 2014 WL 701598 at 17.

[57] *Id.* at 18.

201.   Forest published open letters to physicians and caregivers on its website announcing its plans to discontinue Namenda IR tablets as of August 15, 2014 and urging caregivers to speak with their loved ones' "healthcare provider[s] as soon as possible to discuss switching to Namenda XR."[58]

202.   Forest hoped and expected that the February 14, 2014 public announcement and letters to physicians and caregivers would spur the "hard switch," but it also took other actions to ensure the success of its anticompetitive scheme.

203.   For example, Forest took steps to make it more difficult for Namenda IR to be sold to Medicare patients — the largest customer base for the drug.

204.   On February 18, 2014, Forest informed CMS by letter, that Forest was planning to discontinue Namenda IR on August 15, 2014 and that CMS should remove Namenda IR from the 2015 Formulary Reference File ("FRF"), which Forest knew would have the additional effect of discouraging health plans and third-party payers, such as Plaintiffs' Assignors, from including Namenda IR in their own formularies. As a result, health plans and third-party payers were more likely to discontinue covering Namenda IR starting in January 2015, making it more difficult for physicians to prescribe Namenda IR.

205.   Forest knew that if Namenda IR was not listed on the 2015 FRF, it decreased the chances that health plans would include Namenda IR on their formularies beginning in January 2015, thus making it more difficult for physicians to prescribe Namenda IR.

206.   Forest also ensured that its partner Merz was fully invested in the hard switch. Knowing that Forest would have to modify its pricing of Namenda as part of the overall hard switch campaign, Forest sought to and did lower any immediate financial burden on Forest from

---

[58] *Id.*

the hard switch by soliciting Merz to accept a reduced royalty on the "Namenda Franchise" to 15%, compared with the then existing royalty rate of 20%.

207.    Merz agreed to a lesser and revised royalty in order to share in the extra profit from the hard switch. By Forest's analysis, "Merz would gain an additional $330 million in royalties from the hard switch." Merz agreed to the lower royalty knowing that Forest was predicting that Namenda XR net sales would double from the hard switch, as compared to soft switch.

### 2. Forest Repeatedly Exaggerated the Imminence of Its Plans to Discontinue Namenda IR in Order to Maintain Constant Pressure on Physicians and Patients to Switch to Namenda XR

208.    Between February and June 2014, Forest regularly emphasized publicly its intent to discontinue Namenda IR on August 15, 2014.

209.    In its Form 10-K filing with the Securities and Exchange Commission for fiscal year 2013 (ending March 31, 2014), Forest made multiple representations that it would discontinue Namenda IR on August 15, 2014.

210.    However, high level executives at Forest were aware at the time that problems in the manufacturing and supply of Namenda XR presented a substantial risk that Forest would be unable to discontinue Namenda IR by August 15, 2014 because it would be unable to supply the market with sufficient amounts of Namenda XR to support the anticipated demand.

211.    Instead of abandoning the anticompetitive product hop strategy altogether, Forest decided to announce a slight delay, but still maintain publicly that the discontinuation of Namenda IR was imminent so as to continue to exert coercive pressure on physicians and patients to switch to Namenda XR. Forest issued a statement on June 10, 2014 announcing that Forest would no longer be discontinuing Namenda IR on August 15, 2014 but would instead continue to market

Namenda IR "through Fall 2014."[59]

212.    On November 5, 2014, in the Actavis 3rd Quarter Earnings Press Release, the company confirmed that it had regained the ability to fully supply the market with Namenda XR.

213.    The announced discontinuation of Namenda IR had the intended effect of forcing a wave of conversion from Namenda IR to Namenda XR.[60] Since January 2014, the conversion rate increased from 15% or less[61] to about 50% in anticipation of the lack of availability of Namenda IR.[62]

214.    On December 11, 2014, Judge Sweet of the United States District Court for the Southern District of New York, granted an injunction requiring Forest (and its parent company, Actavis) to continue to make Namenda IR available until 30 days after July 11, 2015.[63] The Second Circuit affirmed the injunction on May 22, 2015.[64] While the injunction weakened the future effects of Forest's product hop strategy to some extent, the anticompetitive effects of the scheme have been substantially and irreversibly accomplished, because anyone converted to Namenda XR is likely to stay converted and therefore consumers, health insurers, and third-party payers, such as Plaintiffs' Assignors, are continuing to pay for a more-expensive brand-name drug instead of a low-cost generic memantine product.

---

[59] *Id*. at 22.

[60] There is no difference in the coercive effect between complete discontinuation and the alternative limited distribution strategies that Forest has considered. The sole purpose of any such strategy would be to reduce antitrust scrutiny while accomplishing the exact same anticompetitive effects.

[61] Forest Laboratories Q3 2014 Earnings Call Transcript, January 21, 2014, p. 14.

[62] *See Namenda I*, 2014 WL 701598 at 29.

[63] *Id*. at 1.

[64] *Namenda II*, 787 F.3d at 662.

C.     **Effects of the Product Hop Scheme**

215.    The only difference between Namenda IR and Namenda XR – which was crucial to Forest's anticompetitive scheme – was dosage form. Forest exploited this difference for one reason: it knew that generic memantine would not and could not be considered "AB-rated" to Namenda XR, and thus pharmacists would not and could not legally substitute the less-expensive generic memantine when presented with a prescription for Namenda XR. Such automatic substitution of less-expensive AB-rated generics at the pharmacy counter is the most efficient market means by which generic competition reduces drug prices. Forest's introduction of Namenda XR disrupted this normally occurring efficient competitive mechanism whereby consumers are afforded discounted prices at the expiration of exclusivity periods for brand-name drugs.

216.    Defendants' exclusionary conduct has delayed, prevented, and impeded the sale of generic memantine in the United States, and unlawfully enabled Forest to sell significantly more Namenda at artificially inflated prices. To the extent that Forest had any valid business purpose for the product hop to Namenda XR, that purpose is outweighed by the anticompetitive effects of the conduct. Forest's and Merz's conduct had the intended effect of allowing it to maintain and extend its monopoly and exclude competition in the relevant market, to the detriment of all memantine hydrochloride purchasers, including Plaintiffs' Assignors. Accordingly, the anticompetitive effects of Forest's conduct clearly outweigh the purported procompetitive benefits (if any) of such conduct.

217.    Similarly, Forest and Merz cannot justify its conduct with any supposed consumer benefit, as the enormous cost savings offered by generic drugs outweigh any supposed benefit from Namenda XR. Forest's exclusionary motive is also illustrated by its public willingness to

sacrifice profits as part of the product hop strategy, although it entered into a secret agreement with Merz to help offset any shore term decrease in revenue. Forest's and Merz's decision to incur the extra costs necessary to change formulations was economically rational only if the change had the effect of excluding generic competition for Namenda IR. But for the impact on generic competition, Forest and Merz would not have invested the resources necessary to bring Namenda XR to the market. But for the impact on generic competition, it would not have been economically rational to invest in licensing the supposed extended-release technology, developing the interchangeable Namenda XR formulation, seeking FDA approval of that formulation, and changing the Namenda tablet manufacturing processes. The conversion from the original Namenda formulation to the new Namenda XR formulation reduced Forest's short-term profits and made economic sense only because of the long-term anticompetitive effects of obstructing generic challengers' most efficient means of competing.

218.    Had Forest not forced the conversion of a substantial portion of the memantine hydrochloride market to the new formulation prior to the entry of generic equivalents to Namenda IR, physicians and patients would have been able to weigh the relative benefits and prices of the two formulations, and would have been able to choose the formulation and price point they preferred. Forest introduced Namenda XR and took actions described above with respect to discontinuing Namenda IR in order to deny consumers that choice and preserve its monopoly profits.

219.    Had Forest not substantially converted the memantine hydrochloride market to the Namenda XR formulation, a launch of AB-rated generic equivalent to Namenda IR would have quickly captured the bulk of memantine hydrochloride sales in the market. As a result, most, if not all, of the prescriptions that are now being filled with Namenda XR instead would have been filled

with generic memantine.

220.     Moreover, had generic Namenda IR launched before Namenda XR (as might have occurred but for the Contingent Entry Agreements), the generics would have quickly captured the bulk of brand-name Namenda IR sales, and the subsequent launch of Namenda XR (assuming it happened at all) would have had little effect on the sales of generic Namenda IR. As a result, generic Namenda IR would have captured the vast majority of the United States' memantine hydrochloride market and most, if not all, of the prescriptions that are now being filled with Namenda XR instead would have been filled with generic memantine.

## MARKET POWER AND RELEVANT MARKET

221.     At all relevant times, Forest had the power to maintain the price of memantine hydrochloride at supracompetitive levels without losing substantial sales to other products.

222.     Namenda IR does not exhibit significant, positive cross-elasticity of demand with respect to price with any other product other than an AB-rated generic equivalent of Namenda IR.

223.     At all relevant times, there were only 5 drugs approved by the FDA for the treatment of Alzheimer's: Aricept, Cognex, Exelon, Razadyne, and Namenda. Cognex was withdrawn from the market in 2012 because it was toxic. None of these drugs are substitutes for Namenda.

224.     Aricept, Cognex, Exelon, and Razadyne are acetylcholinesterase inhibitors ("AChEIs") and all work in the same basic manner. AChEIs reduce the breakdown in the brain of a chemical called acetycholine, a chemical messenger that transmits information between nerve cells. However, Alzheimer's destroys the cells that make acetycholine, in turn making AChEIs less effective as the disease progresses.

225.     Memantine hydrochloride (*i.e.* Namenda) as an NMDA functions differently than AChEIs. Memantine hydrochloride works to prevent the overstimulation of glutamate, an amino

acid that excites nerves, and in excess, is a powerful nerve-cell killer. Namenda is the only NMDA antagonist approved by the FDA for treatment in Alzheimer's in the United States.

226.    Namenda is not generally prescribed as a substitute for AChEIs. Instead, the drugs are usually prescribed together, or at different stages. About 70% of Alzheimer's patients taking Namenda are taking an AChEI as well. Doctors commonly prescribe an AChEI first, and then Namenda is either added or patients are moved to Namenda when the disease has progressed to a moderate stage and AChEIs become ineffective. Although there is little clinical support for the use of Namenda for Alzheimer's patients in the early stages of the disease, some physicians will prescribe it in conjunction with an AChEI when the diagnosis is first made, relying on the fact that there are few significant adverse side effects associated with Namenda.

227.    Because of its unique profile, Namenda, and its AB-rated generic equivalent, is differentiated from all other products.

228.    Forest needed to control only the memantine hydrochloride market to maintain monopolistic prices. Only the market entry of a competing AB-rated generic equivalent to Namenda IR would render Forest unable to profitably maintain monopolistic prices of its brand-name memantine hydrochloride product without losing substantial sales.

229.    Forest sold brand-name Namenda at prices well in excess of marginal costs and the competitive price and enjoyed high profit margins.

230.    The Defendants have had and continue to exercise the power to exclude generic competition to its brand-name Namenda products.

231.    At all relevant times, generic competitors enjoyed high barriers to entry with respect to the market for memantine hydrochloride products.

232.    To the extent that Plaintiffs are legally required to define the relevant product

market, the relevant product market at issue in this case is the memantine hydrochloride market.

233.    During the relevant time period, Defendants have been able to profitably maintain the price of its brand-name Namenda products well above competitive levels.

234.    The relevant geographic market is the United States and its territories.

235.    At all times relevant, Forest has had a 100% market share in the relevant market.

## **MARKET EFFECTS**

236.    The generic competitors would have entered the market with their generic versions of Namenda IR much earlier but for the unlawful anticompetitive conduct alleged above.

237.    The Defendants' conduct directly injured Plaintiffs' Assignors because it forced them to pay millions of dollars in overcharges on their Namenda purchases.

238.    If generic competition of Namenda IR had not been unlawfully delayed, Plaintiffs' Assignors would have paid less for Namenda IR by substituting purchases of less-expensive AB-rated generic equivalents of Namenda IR for their purchases of more-expensive brand Namenda XR.

239.    But for the anticompetitive conduct alleged herein, Forest's efforts to switch the market from Namenda IR to Namenda XR would not have significantly affected generic manufacturers' sales of generic memantine because the majority, approximately 90% of the sales of Namenda IR would have switched to the generic version before the introduction of Namenda XR – if Namenda XR would have launched at all – at prices below any brand-name Namenda product.

240.    Upon entering the market, generic equivalents of brand-name drugs are priced significantly below the brand-name drugs to which they are AB-rated. When multiple generic products are on the market, prices for the brand-name drug and its generic equivalents fall even

further because of the increased competition.

241.   But for the Defendants' unlawful anticompetitive conduct, generic competition would have forced a decrease in the price of brand-name Namenda, and price competition among the suppliers of brand-name and generic memantine hydrochloride would have been intense.

242.   As a result, brand-name manufacturers have a significant financial interest in delaying and impairing generic competition – causing purchasers substantial economic harm.

243.   Moreover, due to Defendants' anticompetitive conduct, other generic manufacturers were discouraged from and/or delayed in: (1) launching generic versions of Namenda IR; and/or (2) challenging the validity or infringement of the '703 patent in court.

244.   Thus, the Defendants' unlawful conduct deprived Plaintiffs' Assignors of the benefits of competition that the antitrust laws were designed to ensure.

## ANTITRUST IMPACT

245.   During the relevant period, Plaintiffs' Assignors indirectly purchased substantial amounts of Namenda from Forest. As a result of Defendants' unlawful conduct, Plaintiffs' Assignors were compelled to pay, and did pay, artificially inflated prices for Namenda. Those prices were substantially greater than those that Plaintiffs' Assignors would have paid absent the illegal conduct alleged herein.

246.   As a consequence, Plaintiffs' Assignors have sustained substantial losses and damage to their business and property in the form of overcharges. The full amount and forms and components of such damages will be calculated after discovery and upon proof at trial.

247.   General economic theory recognizes that any overcharge at a higher level of distribution in the chain of distribution for memantine hydrochloride results in higher prices at

every level below.[65] Professor Hovenkamp goes on to state that "[e]very person at every stage in the chain will be poorer as a result of the monopoly price at the top." He also acknowledges that "[t]heoretically, one can calculate the percentage of overcharge that a firm at one distribution level will pass on to those at the next level."

248.    Defendants' anticompetitive conduct enabled them to charge consumers indirectly and third-party payers, like Plaintiffs' Assignors, prices in excess of what they otherwise would have been able to charge.

249.    The prices were inflated as a direct and foreseeable result of Defendants' anticompetitive conduct.

250.    The inflated prices Plaintiffs' Assignors paid are traceable to, and the foreseeable result of, the overcharges by Defendants.

**EFFECTS ON INTERSTATE AND INTRASTATE COMMERCE**

251.    At all material times, Defendants manufactured, marketed, distributed, and sold substantial amounts of Namenda IR and Namenda XR in a continuous and uninterrupted flow of commerce across state and national lines throughout the United States.

252.    At all material times, Defendants transmitted funds, and contracts, invoices, and other forms of business communications and transactions, in a continuous and uninterrupted flow of commerce across state and national lines in connection with the sale of Namenda IR and Namenda XR.

253.    At all material times, the Generic Manufacturer Defendants manufactured, distributed, and sold substantial amounts of generic Namenda in a continuous and uninterrupted

---

[65] Herbert Hovenkamp, FEDERAL ANTITRUST POLICY, THE LAW OF COMPETITION AND ITS PRACTICE, p. 624 (1994).

flow of commerce across state and national lines throughout the United States.

254.    At all material times, Defendants transmitted funds, and contracts, invoices, and other forms of business communications and transactions, in a continuous and uninterrupted flow of commerce across state and national lines in connection with the sale of Namenda IR, Namenda XR, and AB-rated generics.

255.    In furtherance of their efforts to monopolize and restrain competition, Defendants employed the United States mail and interstate and international telephone lines and means of interstate and international travel. Defendants' activities were within the flow of and have substantially affected (and continue to substantially affect) interstate commerce.

256.    Defendants' anticompetitive conduct had substantial intrastate effects in that, retailers within each state were foreclosed from offering generic memantine to Plaintiffs' Assignors. The complete foreclosure of generic memantine directly impacted and disrupted commerce for Plaintiffs' Assignors by forcing them to buy Namenda XR for a substantially higher price.

## CAUSES OF ACTION

## VIOLATIONS OF STATE ANTITRUST LAWS

257.    The following allegations apply to all of Plaintiffs' state law antitrust claims.

258.    At all relevant times, Forest[66] possessed monopoly power in the relevant market. Forest and Merz possessed the power to control prices in, prevent prices from falling in, and exclude competitors from the relevant market.

259.    As described herein, Forest and Merz knowingly and willfully engaged in

---

[66] References to "Forest" in this section and the below claims for relief includes Forest successor entities Actavis and Allergan.

anticompetitive conduct designed to unlawfully extend and maintain its monopoly power.

260.    Through the anticompetitive conduct alleged extensively herein, Forest and Merz willfully maintained its monopoly power through restrictive or exclusionary conduct, rather than by means of greater business acumen, in order to exclude competition for Namenda and injured Plaintiffs' Assignors thereby.

261.    As stated more fully above, Defendants knowingly, willfully, and wrongfully maintained its monopoly power and harmed competition by:

  a. listing a patent they knew to be invalid and/or unenforceable in the Orange Book;

  b. asserting that patent in sham lawsuits against generic Namenda manufacturers to delay generic competition;

  c. paying potential first filing generic manufacturers and conveying other benefits to first filing generic manufacturers to delay marketing generic Namenda;

  d. deterring other generic manufacturers from marketing generic Namenda through the use of an anticompetitive acceleration clause;

  e. switching the market from Namenda IR to Namenda XR – a nearly identical product with no benefits or improvements – during the purchase delay; and

  f. withdrawing Namenda IR from the market in order to coerce doctors and patients to switch to Namenda XR.

262.    The goal, purpose, and effect of Forest's anticompetitive conduct was to delay and impair the sale of generic memantine products in the United States.

263.    By engaging in the foregoing conduct, Forest and Merz have intentionally and wrongfully maintained monopoly power in the relevant market in violation of the state antitrust statutes listed below.

264.    To the extent Forest and Merz are permitted to assert one, there is and was no cognizable, non-pretextual procompetitive justification for Forest's actions comprising the

anticompetitive scheme that outweigh the harmful effects. Even if there were some conceivable justification that Forest and Merz were permitted to assert, the scheme is and was broader than necessary to achieve such a purpose.

265.   Forest and Merz entered into unlawful agreements with the Generic Manufacturer Defendants to settle patent infringement suits as part of an overall anticompetitive scheme to unlawfully maintain its monopoly power in the market for memantine hydrochloride as described herein.

266.   Had manufacturers of generic memantine entered into the market and lawfully competed in a timely fashion, Plaintiffs' Assignors would have substituted lower-priced generic memantine for some or all of their memantine hydrochloride needs, and/or would have paid lower net prices earlier/or in far greater quantities on their remaining brand-name Namenda purchases.

267.   In addition, as explained in detail above, as part of an overall scheme to maintain its monopoly power in the market for memantine hydrochloride, Forest and Merz unlawfully switched the conversion of the memantine hydrochloride market from Namenda IR to Namenda XR (a "product hop") by *inter alia*: (i) publicizing to doctors, caregivers and the general public that the discontinuation of Namenda IR was imminent; (ii) significantly limiting or attempting to limit the distribution of Namenda IR; and (iii) requesting that CMS remove Namenda IR from the 2015 Formulary Reference File ("FRF"). Namenda XR is not safer or more effective than Namenda IR.

268.   Also described herein, Forest and Merz entered into anticompetitive agreements with the Generic Manufacturer Defendants to delay generic entry.

269.   The goal, purpose and effect of Forest's and Merz's unlawful conduct was to maintain and extend its monopoly power in the memantine hydrochloride market. Forest's

unlawful anticompetitive scheme to prevent, delay, and/or minimize the success of the introduction into the United States marketplace for any generic versions of Namenda IR enabled Forest to continue charging supra-competitive prices for memantine hydrochloride without a substantial loss of sales.

270.    Plaintiffs' Assignors indirectly purchased substantial amounts of Namenda IR 5 or 10 mg tablets, or Namenda XR capsules from Forest during the relevant time period.

271.    As a result of Forest's and Merz's unlawful conduct, Plaintiffs' Assignors were forced to pay, and did pay, artificially inflated prices for Namenda products. Plaintiffs' Assignors paid prices for Namenda that were substantially greater than the prices that they would have paid absent the illegal conduct alleged herein because: (a) Plaintiffs' Assignors were deprived of the opportunity to purchase lower-priced generic versions of Namenda IR instead of the more expensive brand-name Namenda IR (and Namenda XR); and/or (b) the price of brand-name Namenda was artificially inflated by Forest's illegal conduct.

## COUNT I
### VIOLATION OF ALABAMA ANTITRUST LAW
#### Ala. Code § 6-5-60
#### (Against All Defendants)

272.    Plaintiffs re-allege and incorporate herein by reference each of the allegations contained in the preceding paragraphs as if fully set forth herein.

273.    Defendants have intentionally and unlawfully maintained its monopoly power and engaged in a combination and conspiracy in restraint of trade in violation of Ala. Code § 6-5-60.

274.    Ala. Code § 6-5-60 provides that "any person, firm, or corporation injured or damaged by an unlawful trust, combine, or monopoly, or its effect, direct, or indirect, may in each instance of such injury or damage, recover the sum of $500 and all actual damages."

275.    Defendants knew or should have known that their conduct was in violation of Ala.

Code § 6-5-60.

276.    Defendants' illegal conduct substantially affected Alabama commerce and consumers.

277.    Plaintiffs' analysis of its Assignors' data identified one or more purchases of Namenda in the State of Alabama.

278.    Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a proximate result of Defendants' unlawful behavior, at a minimum, in the form of increased and unfair prices paid for Namenda as described herein.

279.    Accordingly, Plaintiffs seek all forms of relief available under Ala. Code § 6-5-60.

## COUNT II
## VIOLATION OF ARIZONA ANTITRUST LAW
### Ariz. Rev. Stat. Ann. §§ 44-1401, *et seq.*
### (Against All Defendants)

280.    Plaintiffs re-allege and incorporate herein by reference each of the allegations contained in the preceding paragraphs as if fully set forth herein.

281.    Defendants have intentionally and unlawfully maintained its monopoly power and engaged in a combination and conspiracy in restraint of trade in violation of Ariz. Rev. Stat. Ann. §§ 44-1401, *et seq.* ("Arizona Uniform Antitrust Act").

282.    The Arizona Uniform Antitrust Act declares "the establishment, maintenance or use of a monopoly or an attempt to establish a monopoly of trade or commerce … for the purpose of excluding competition or controlling, fixing, or maintaining prices is unlawful." Ariz. Rev. Stat. Ann. § 44-1403. Additionally, "a contract, combination or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce" is illegal. Ariz. Rev. Stat. Ann. § 44-1402.

283.    Plaintiffs and Defendants are "persons" within the meaning of Ariz. Rev. Stat. Ann.

§ 44-1401.

284.    Defendants knew or should have known that their conduct was in violation of the Arizona Uniform Antitrust Act.

285.    Defendants' illegal conduct substantially affected Arizona commerce and consumers.

286.    Plaintiffs' analysis of its Assignors' data identified one or more purchases of Namenda in the State of Arizona.

287.    Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a proximate result of Defendants' unlawful behavior, at a minimum, in the form of increased and unfair prices paid for Namenda as described herein.

288.    Simultaneously with the filing of this Complaint, Plaintiffs will serve a copy on the Attorney General pursuant to Ariz. Rev. Stat. Ann. § 44-1415.

289.    Accordingly, Plaintiffs seek all forms of relief available under the Arizona Uniform Antitrust Act, Ariz. Rev. Stat. Ann. §§ 44-1401, *et seq.*

<u>**COUNT III**</u>
**VIOLATION OF CALIFORNIA ANTITRUST LAW**
**Cal. Bus. & Prof. Code §§ 16700, *et seq.***
**(Against All Defendants)**

290.    Plaintiffs re-allege and incorporate herein by reference each of the allegations contained in the preceding paragraphs as if fully set forth herein.

291.    Defendants have intentionally and unlawfully maintained its monopoly power and engaged in a combination and conspiracy in restraint of trade in violation of Cal. Bus. & Prof. Code §§ 16700, *et seq.* ("The Cartwright Act").

292.    The Cartwright Act prohibits a combination of two or more persons "(a) [t]o create or carry out restrictions in trade or commerce ... (c) to prevent competition in manufacturing,

making ... sale or purchase of merchandise ..." Cal. Bus. & Prof. Code § 16720.

293.    Plaintiffs and Defendants are "persons" within the meaning of Cal. Bus. & Prof. Code § 16702.

294.    Defendants knew or should have known that their conduct was in violation of The Cartwright Act.

295.    Defendants' illegal conduct substantially affected California commerce and consumers.

296.    Plaintiffs' analysis of its Assignors' data identified one or more purchases of Namenda in the State of California.

297.    Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a proximate result of Defendants' unlawful behavior, at a minimum, in the form of increased and unfair prices paid for Namenda as described herein.

298.    Accordingly, Plaintiffs seek all forms of relief available under The Cartwright Act, Cal. Bus. & Prof. Code §§ 16700, *et seq*.

## COUNT IV
### VIOLATION OF THE DISTRICT OF COLUMBIA ANTITRUST LAW
### D.C. Code Ann. §§ 24-4501, *et seq*.
### (Against All Defendants)

299.    Plaintiffs re-allege and incorporate herein by reference each of the allegations contained in the preceding paragraphs as if fully set forth herein.

300.    Defendants have intentionally and unlawfully maintained its monopoly power and engaged in a combination and conspiracy in restraint of trade in violation of D.C. Code Ann. §§ 24-4501, *et seq.*

301.    D.C. Code Ann. § 28-4503 makes it "unlawful for any person to monopolize, attempt to monopolize, or combine or conspire with any other person or persons to monopolize

71

any part of trade or commerce." Additionally, "every contract, combination in the form of a trust or otherwise, or conspiracy in restraint of trade or commerce" is illegal.

302.    Defendants and Plaintiffs are "persons" within the meaning of D.C. Code Ann. § 28-4501.

303.    Indirect purchasers are deemed injured pursuant to D.C. Code Ann. § 28-4509(a).

304.    Defendants knew or should have known that their conduct was in violation of D.C. Code Ann. §§ 24-4501, *et seq.*

305.    Defendants' illegal conduct substantially affected District of Columbia commerce and consumers.

306.    Plaintiffs' analysis of its Assignors' data identified one or more purchases of Namenda in the District of Columbia.

307.    Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a proximate result of Defendants' unlawful behavior, at a minimum, in the form of increased and unfair prices paid for Namenda as described herein.

308.    Accordingly, Plaintiffs seek all forms of relief available under D.C. Code Ann. §§ 24-4501, *et seq.*

## COUNT V
### VIOLATION OF ILLINOIS ANTITRUST LAW
### 740 Ill. Comp. Stat. 10/ *et seq.*
### (Against All Defendants)

309.    Plaintiffs re-allege and incorporate herein by reference each of the allegations contained in the preceding paragraphs as if fully set forth herein.

310.    Defendants have intentionally and unlawfully maintained its monopoly power and engaged in a combination and conspiracy in restraint of trade in violation of 740 Ill. Comp. Stat. 10/, *et seq.* ("Illinois Antitrust Act").

311. The Illinois Antitrust Act makes unlawful any attempt to "[e]stablish, maintain, use or attempt to acquire monopoly power over any substantial part of trade or commerce ... for the purpose of excluding competition or of controlling, fixing, or maintaining prices. " 740 Ill. Comp. Stat. 10/3. Additionally, "any contract with" or "conspiracy with" another person who is a competitor for the purpose of or with the effect of "fixing, controlling, or maintaining the price" of a commodity or "fixing, controlling, maintaining, limiting ... production, manufacture ... or sale ..." for the purpose of fixing, controlling, or maintaining the price is illegal. *Id.*

312. Plaintiffs and Defendants are "persons" within the meaning of 740 Ill. Comp. Stat. 10/4.

313. Defendants knew or should have known that their conduct was in violation of the Illinois Antitrust Act.

314. Defendants' illegal conduct substantially affected Illinois commerce and consumers.

315. Plaintiffs' analysis of its Assignors' data identified one or more purchases of Namenda in the State of Illinois.

316. Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a proximate result of Defendants' unlawful behavior, at a minimum, in the form of increased and unfair prices paid for Namenda as described herein.

317. Accordingly, Plaintiffs seek all forms of relief available under the Illinois Antitrust Act, 740 Ill. Comp. Stat. 10/, *et seq*.

## COUNT VI
## VIOLATION OF IOWA ANTITRUST LAW
### Iowa Code §§ 553.1 *et seq*.
### (Against All Defendants)

318. Plaintiffs re-allege and incorporate herein by reference each of the allegations

contained in the preceding paragraphs as if fully set forth herein.

319.     Defendants have intentionally and unlawfully maintained its monopoly power and engaged in a combination and conspiracy in restraint of trade in violation of Iowa Code §§ 553.1, *et seq.* ("Iowa Competition Law").

320.     Iowa Competition Law states "a person shall not attempt to establish or establish, maintain, or use a monopoly of trade or commerce in a relevant market for the purpose of excluding competition or of controlling, fixing, or maintaining prices." Iowa Code § 553.5. Additionally, "a contract, combination, or conspiracy between two or more persons shall not restrain or monopolize trade or commerce in a relevant market." Iowa Code § 553.4.

321.     Plaintiffs and Defendants are "persons" within the meaning of Iowa Code § 553.3.

322.     Defendants knew or should have known that their conduct was in violation of Iowa Competition Law.

323.     Defendants' illegal conduct substantially affected Iowa commerce and consumers.

324.     Plaintiffs' analysis of its Assignors' data identified one or more purchases of Namenda in the State of Iowa.

325.     Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a proximate result of Defendants' unlawful behavior, at a minimum, in the form of increased and unfair prices paid for Namenda as described herein.

326.     Accordingly, Plaintiffs seek all forms of relief available under Iowa Competition Law, Iowa Code §§ 553.1, *et seq*.

**COUNT VII**
**VIOLATION OF KANSAS ANTITRUST LAW**
**Kan. Stat. Ann. §§ 50-101, *et seq*.**
**(Against All Defendants)**

327.     Plaintiffs re-allege and incorporate herein by reference each of the allegations

contained in the preceding paragraphs as if fully set forth herein.

328.    Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade in violation of Kan. Stat. Ann. §§ 50-101, *et seq.* ("Kansas Restraint of Trade Act").

329.    The Kansas Restraint of Trade Act makes "trusts, combinations and agreements in restraint of trade and free competition" unlawful. Kan. Stat. Ann. § 50-112. Additionally, "all arrangements, contracts, agreements, trusts, or combinations between persons made with a view or which tend to prevent full and free competition in the ... sale of articles imported into this state ... are against public policy, unlawful, and void." *Id.*

330.    Plaintiffs and Defendants are "persons" within the meaning of Kan. Stat. Ann. § 50-161.

331.    The restraint of trade act "shall not be construed to prohibit: ... (2) actions or proceedings by indirect purchasers." Kan. Stat. Ann. § 50-161(b).

332.    Defendants knew or should have known that their conduct was in violation of the Kansas Restraint of Trade Act.

333.    Defendants' illegal conduct substantially affected Kansas commerce and consumers.

334.    Plaintiffs' analysis of its Assignors' data identified one or more purchases of Namenda in the State of Kansas.

335.    Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a proximate result of Defendants' unlawful behavior, at a minimum, in the form of increased and unfair prices paid for Namenda as described herein.

336.    Accordingly, Plaintiffs seek all forms of relief available under the Kansas Restraint

of Trade Act, Kan. Stat. Ann. §§ 50-101, *et seq.*

## COUNT VIII
## VIOLATION OF MAINE ANTITRUST LAW
### Me. Rev. Stat. Ann. tit 10 §§ 1101, *et seq.*
### (Against All Defendants)

337.    Plaintiffs re-allege and incorporate herein by reference each of the allegations contained in the preceding paragraphs as if fully set forth herein.

338.    Defendants have intentionally and unlawfully maintained its monopoly power and engaged in a combination and conspiracy in restraint of trade in violation of Me. Rev. Stat. Ann. tit. §§ 1101, *et seq.*

339.    Me. Rev. Stat. Ann. tit. 10 § 1102 makes it illegal to "monopolize, attempt to monopolize or combine or conspire with any other person or persons to monopolize." Additionally, "every contract, combination in the form of trusts or otherwise, or conspiracy, in restraint of trade or commerce" is illegal. Me. Rev. Stat. Ann. tit. 10 § 1101.

340.    Anyone "injured directly or indirectly" may bring suit under Me. Rev. Stat. tit. 10 § 1104.

341.    Defendants knew or should have known that their conduct was in violation of Me. Rev. Stat. Ann. tit. 10 §§ 1101, *et. seq.*

342.    Defendants' illegal conduct substantially affected Maine commerce and consumers.

343.    Plaintiffs' analysis of its Assignors' data identified one or more purchases of Namenda in the State of Maine.

344.    Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a proximate result of Defendants' unlawful behavior, at a minimum, in the form of increased and unfair prices paid for Namenda as described herein.

345.     Accordingly, Plaintiffs seek all forms of relief available under Me. Rev. Stat. Ann. tit. 10 §§ 1101, *et. seq.*

**COUNT IX**
**VIOLATION OF MICHIGAN ANTITRUST LAW**
**Mich. Comp. Laws Ann. §§ 445.771, *et seq.***
**(Against All Defendants)**

346.     Plaintiffs re-allege and incorporate herein by reference each of the allegations contained in the preceding paragraphs as if fully set forth herein.

347.     Defendants have intentionally and unlawfully maintained its monopoly power and engaged in a combination and conspiracy in restraint of trade in violation of Mich. Comp. Laws Ann. §§ 445.771, *et seq.* ("Michigan Antitrust Reform Act").

348.     The Michigan Antitrust Reform Act makes unlawful the "establishment, maintenance, or use of a monopoly, or any attempt to establish a monopoly, of trade or commerce in a relevant market by any person, for the purpose of excluding or limiting competition or controlling, fixing, or maintaining prices ... " Mich. Comp. Laws Ann. § 445.773. Additionally, "a contract, combination, or conspiracy between 2 or more persons in restraint of, or to monopolize, trade or commerce in a relevant market" is unlawful. Mich. Comp. Laws Ann. § 445.772.

349.     Plaintiffs and Defendants are "persons" within the meaning of Mich. Comp. Laws Ann. § 445.771.

350.     Any person "threatened with injury or injured directly or indirectly" may bring action under Mich. Comp. Laws Ann. § 445.778(2).

351.     Defendants knew or should have known that their conduct was in violation of the Michigan Antitrust Reform Act.

352.     Defendants' illegal conduct substantially affected Michigan commerce and consumers.

353. Plaintiffs' analysis of its Assignors' data identified one or more purchases of Namenda in the State of Michigan.

354. Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a proximate result of Defendants' unlawful behavior, at a minimum, in the form of increased and unfair prices paid for Namenda as described herein.

355. Accordingly, Plaintiffs seek all forms of relief available under the Michigan Antitrust Reform Act, Mich. Comp. Laws Ann. §§ 445.771, *et seq*.

## COUNT X
## VIOLATION OF MINNESOTA ANTITRUST LAW
### Minn. Stat. Ann. §§ 325D.49, *et seq*.
### (Against All Defendants)

356. Plaintiffs re-allege and incorporate herein by reference each of the allegations contained in the preceding paragraphs as if full set forth herein.

357. Defendants have intentionally and unlawfully maintained its monopoly power and engaged in a combination and conspiracy in restraint of trade in violation of Minn. Stat. Ann. §§ 325D.49, *et seq.* ("Minnesota Antitrust Law of 1971").

358. The Minnesota Antitrust Law of 1971 makes unlawful the "establishment, maintenance, or use of, or any attempt to establish, maintain, or use monopoly power over any part of trade or commerce by any person or persons for the purpose of affecting competition or controlling, fixing, or maintaining prices ... " Minn. Stat. Ann. § 325D.52. Additionally, "a contract, combination, or conspiracy between two or more persons in unreasonable restraint of trade or commerce" is unlawful. Minn. Stat. Ann. § 325D.51. Any contract, combination, or conspiracy with the purpose of effect of "affecting, fixing, controlling or maintaining the market price, or fee of any commodity or service" or "affecting, fixing, controlling, maintaining, limiting, or discontinuing the production, manufacture, mining, sale or supply of any commodity … for the

purpose or with the effect of affecting, fixing, controlling, or maintaining the market price, rate, or fee of the commodity or service" is unlawful. Minn. Stat. Ann. § 325D.53.

359.    Plaintiffs and Defendants are "persons" within the meaning of Minn. Stat. Ann. § 325D.50.

360.    The Minnesota Antitrust Law of 1971 allows any person "injured directly or indirectly" to bring an action. Minn. Stat. Ann. § 325D.57.

361.    Defendants knew or should have known that their conduct was in violation of the Minnesota Antitrust Law of 1971.

362.    Defendants' illegal conduct substantially affected Minnesota commerce and consumers.

363.    Plaintiffs' analysis of its Assignors' data identified one or more purchases of Namenda in the State of Minnesota.

364.    Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a proximate result of Defendants' unlawful behavior, at a minimum, in the form of increased and unfair prices paid for Namenda as described herein.

365.    Accordingly, Plaintiffs seek all forms of relief available under the Minnesota Antitrust Law of 1971, Minn. Stat. Ann. §§ 325D.49, *et seq.*.

## COUNT XI
### VIOLATION OF MISSISSIPPI ANTITRUST LAW
#### Miss. Code Ann. §§ 75-21-1, *et seq.*
#### (Against All Defendants)

366.    Plaintiffs re-allege and incorporate herein by reference each of the allegations contained in the preceding paragraphs as if fully set forth herein.

367.    Defendants have intentionally and unlawfully maintained its monopoly power and engaged in a combination and conspiracy in restraint of trade in violation of Miss. Code Ann. §§

75-21-1, *et seq.*

368.    Miss. Code Ann. § 75-21-3 makes unlawful any monopolization or "attempt to monopolize the production, control or sale of any commodity, or the prosecution, management or control of any kind, class or description of business" is unlawful. Additionally, trusts are unlawful, which includes "any combination, contract, understanding, or agreement, express or implied" that would be inimical to public welfare and the effect of which would be restraint of trade and/or any "increase … on the price of a commodity." Miss. Code Ann. § 75-21-1.

369.    Any person "natural or artificial, injured or damaged by a trust or combine … or by its effects direct or indirect" may bring suit.  Miss. Code Ann. § 75-21-9.

370.    Defendants knew or should have known that their conduct was in violation of Miss. Code Ann. §§ 75-21-1, *et seq.*

371.    Defendants' illegal conduct substantially affected Mississippi commerce and consumers.

372.    Plaintiffs' analysis of its Assignors' data identified one or more purchases of Namenda in the State of Mississippi.

373.    Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a proximate result of Defendants' unlawful behavior, at a minimum, in the form of increased and unfair prices paid for Namenda as described herein.

374.    Accordingly, Plaintiffs seek all forms of relief available under Miss. Code Ann. §§ 75-21-1, *et seq.*

**COUNT XII**
**VIOLATION OF NEBRASKA ANTITRUST LAW**
**Neb. Rev. Stat. §§ 59-801, *et seq.***
**(Against All Defendants)**

375.    Plaintiffs re-allege and incorporate herein by reference each of the allegations

contained in the preceding paragraphs as if fully set forth herein.

376.    Defendants have intentionally and unlawfully maintained its monopoly power and engaged in a combination and conspiracy in restraint of trade in violation of Neb. Rev. Stat. §§ 59-801, *et seq.* ("Junkin Act").

377.    The Junkin Act makes it unlawful to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce ..." Neb. Rev. Stat. § 59-802.  Additionally, "every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce" is illegal. Neb. Rev. Stat. § 59-801.

378.    Plaintiffs and Defendants are "persons" within the meaning of Neb. Rev. Stat. § 59-822.

379.    Any person injured, "whether such injured person dealt directly or indirectly with the defendant" may bring suit. Neb. Rev. Stat. § 59-821.

380.    Defendants knew or should have known that their conduct was in violation of the Junkin Act.

381.    Defendants' illegal conduct substantially affected Nebraska commerce and consumers.

382.    Plaintiffs' analysis of its Assignors' data identified one or more purchases of Namenda in the State of Nebraska.

383.    Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a proximate result of Defendants' unlawful behavior, at a minimum, in the form of increased and unfair prices paid for Namenda as described herein.

384.    Accordingly, Plaintiffs seek all forms of relief available under the Junkin Act, Neb.

Rev. Stat. §§ 59-801, *et seq.*

**COUNT XIII**
**VIOLATION OF NEVADA ANTITRUST LAW**
**Nev. Rev. Stat. §§ 598A.010,** *et seq.*
**(Against All Defendants)**

385.    Plaintiffs re-allege and incorporate herein by reference each of the allegations contained in the preceding paragraphs as if fully set forth herein.

386.    Defendants have intentionally and unlawfully maintained its monopoly power and engaged in a combination and conspiracy in restraint of trade in violation of Nev. Rev. Stat. Ann. §§ 598A.010, *et seq.* ("Nevada Unfair Trade Practices Act").

387.    The Nevada Unfair Trade Practices Act prohibits "monopolization of trade or commerce ... including, without limitation, attempting to monopolize or otherwise combining to monopolize trade or commerce ... " Nev. Rev. Stat. Ann. § 598A.060.

388.    Any person injured "directly or indirectly" may bring suit. Nev. Rev. Stat. Ann. § 598A.210(2).

389.    Defendants knew or should have known that their conduct was in violation of the Nevada Unfair Trade Practices Act.

390.    Defendants' illegal conduct substantially affected Nevada commerce and consumers.

391.    Plaintiffs' analysis of its Assignors' data identified one or more purchases of Namenda in the State of Nevada.

392.    Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a proximate result of Defendants' unlawful behavior, at a minimum, in the form of increased and unfair prices paid for Namenda as described herein.

393.    Simultaneously with the filing of this Complaint, Plaintiffs will serve a copy on the

Attorney General pursuant to Nev. Rev. Stat. Ann. § 598A.210(3).

394. Accordingly, Plaintiffs seek all forms of relief available under the Nevada Unfair Trade Practices Act, Nev. Rev. Stat. Ann. §§ 598A.010, *et seq.*

**COUNT XIV**
**VIOLATION OF NEW HAMPSHIRE ANTITRUST LAW**
**N.H. Rev. Stat. Ann. §§ 356:1, *et seq.***
**(Against All Defendants)**

395. Plaintiffs re-allege and incorporate herein by reference each of the allegations contained in the preceding paragraphs as if fully set forth herein.

396. Defendants have intentionally and unlawfully maintained its monopoly power and engaged in a combination and conspiracy in restraint of trade in violation of N.H. Rev. Stat. Ann §§ 356:1, *et seq.*

397. N.H. Rev. Stat. Ann § 356:3 makes unlawful "the establishment, maintenance or use of monopoly power, or any attempt to establish, maintain or use monopoly power over trade or commerce for the purpose of affecting competition or controlling, fixing or maintaining prices ... " Additionally, "every contract, combination, or conspiracy in restraint of trade" is unlawful. N.H. Rev. Stat. Ann § 356:2.

398. Plaintiffs and Defendants are "persons" within the meaning of N.H. Rev. Stat. Ann § 356:1.

399. Any person injured "whether that person dealt directly or indirectly with the defendant" may bring suit. N.H. Rev. Stat. Ann § 356:11.

400. Defendants knew or should have known that their conduct was in violation of N.H. Rev. Stat. Ann §§ 356:1, *et seq.*

401. Defendants' illegal conduct substantially affected New Hampshire commerce and consumers.

402.    Plaintiffs' analysis of its Assignors' data identified one or more purchases of Namenda in the State of New Hampshire.

403.    Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a proximate result of Defendants' unlawful behavior, at a minimum, in the form of increased and unfair prices paid for Namenda as described herein.

404.    Accordingly, Plaintiffs seek all forms of relief available under N.H. Rev. Stat. Ann §§ 356:1, *et seq.*

### COUNT XV
### VIOLATION OF NEW MEXICO ANTITRUST LAW
### N.M. Stat. Ann. §§ 57-1-1, *et seq.*
### (Against All Defendants)

405.    Plaintiffs re-allege and incorporate herein by reference each of the allegations contained in the preceding paragraphs as if fully set forth herein.

406.    Defendants have intentionally and unlawfully maintained its monopoly power and engaged in a combination and conspiracy in restraint of trade in violation of N.M. Stat. Ann. §§ 57-1-1, *et. seq.* ("New Mexico Antitrust Act").

407.    The New Mexico Antitrust Act makes it unlawful "for any person to monopolize or attempt to monopolize or combine or conspire with any other person or persons to monopolize, trade or commerce." N.M. Stat. Ann. § 57-1-2. Additionally, "every contract, agreement, combination or conspiracy of trade or commerce" is illegal. N.M. Stat. Ann. § 57-1-1.

408.    Plaintiffs and Defendants are "persons" within the meaning of N.M. Stat. Ann. § 57-1-1.2.

409.    Any person injured "directly or indirectly" may bring suit under N.M. Stat. Ann. § 57-1-1.3.

410.    Defendants knew or should have known that their conduct was in violation of the

New Mexico Antitrust Act.

411.    Defendants' illegal conduct substantially affected New Mexico commerce and consumers.

412.    Plaintiffs' analysis of its Assignors' data identified one or more purchases of Namenda in the State of New Mexico.

413.    Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a proximate result of Defendants' unlawful behavior, at a minimum, in the form of increased and unfair prices paid for Namenda as described herein.

414.    Accordingly, Plaintiffs seek all forms of relief available under the New Mexico Antitrust Act, N.M. Stat. Ann. §§ 57-1-1, *et. seq.*

## COUNT XVI
### VIOLATION OF NEW YORK ANTITRUST LAW
#### N.Y. Gen. Bus. Law §§ 340, *et seq.*
#### (Against All Defendants)

415.    Plaintiffs re-allege and incorporate herein by reference each of the allegations contained in the preceding paragraphs as if fully set forth herein.

416.    Defendants have intentionally and unlawfully maintained its monopoly power and engaged in a combination and conspiracy in restraint of trade in violation of N.Y. Gen. Bus. §§ 340, *et seq.* ("Donnelly Act").

417.    The Donnelly Act declares "every contract, agreement, arrangement or combination" where a "monopoly ... may be established" or where "competition or the free exercise of any activity ... may be restrained" is illegal. N.Y. Gen. Bus. Law § 340(1).

418.    The fact that "any person who sustained damages by reason of violation of this section has not dealt directly with the defendant shall not bar or otherwise limit recovery." N.Y. Gen. Bus. Law § 340(6).

419. Defendants knew or should have known that their conduct was in violation of the Donnelly Act.

420. Defendants' illegal conduct substantially affected New York commerce and consumers.

421. Plaintiffs' analysis of its Assignors' data identified one or more purchases of Namenda in the State of New York.

422. Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a proximate result of Defendants' unlawful behavior, at a minimum, in the form of increased and unfair prices paid for Namenda as described herein.

423. Simultaneously with the filing of this Complaint, Plaintiffs will serve a copy on the Attorney General pursuant to N.Y. Gen. Bus. Law § 340(5).

424. Accordingly, Plaintiffs seek all forms of relief available under the Donnelly Act, N.Y. Gen. Bus. Law §§ 340, *et seq.*

## COUNT XVII
### VIOLATION OF NORTH CAROLINA ANTITRUST LAW
### N.C. Gen. Stat. Ann. §§ 75-1, *et seq.*
### (Against All Defendants)

425. Plaintiffs re-allege and incorporate herein by reference each of the allegations contained in the preceding paragraphs as if fully set forth herein.

426. Defendants have intentionally and unlawfully maintained its monopoly power and engaged in a combination and conspiracy in restraint of trade in violation of N.C. Gen. Stat. Ann. §§ 75-1, *et seq.*

427. N.C. Gen. Stat. Ann. § 75-2.1 makes it "unlawful for any person to monopolize, or attempt to monopolize, or combine or conspire with any other person or persons to monopolize, any part of trade or commerce." Additionally, "every contract, combination in the form of trust or

otherwise, or conspiracy in restraint of trade or commerce" is illegal. N.C. Gen. Stat. Ann. § 75-1.

428.    Defendants knew or should have known that their conduct was in violation of N.C. Gen. Stat. Ann. §§ 75-1, *et seq.*

429.    Defendants' illegal conduct substantially affected North Carolina commerce and consumers.

430.    Plaintiffs' analysis of its Assignors' data identified one or more purchases of Namenda in the State of North Carolina.

431.    Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a proximate result of Defendants' unlawful behavior, at a minimum, in the form of increased and unfair prices paid for Namenda as described herein.

432.    Accordingly, Plaintiffs seek all forms of relief available under N.C. Gen. Stat. Ann. §§ 75-1, *et seq.*

**COUNT XVIII**
**VIOLATION OF OREGON ANTITRUST LAW**
**Ore. Rev. Stat. §§ 646.705, *et seq*.**
**(Against All Defendants)**

433.    Plaintiffs re-allege and incorporate herein by reference each of the allegations contained in the preceding paragraphs as if fully set forth herein.

434.    Defendants have intentionally and unlawfully maintained its monopoly power and engaged in a combination and conspiracy in restraint of trade in violation of Ore. Rev. Stat. §§ 646.705, *et seq.*

435.    Ore. Rev. Stat. § 646.730 makes it unlawful for any person to "monopolize, or attempt to monopolize, combine or conspire with any other person or persons, to monopolize any part of trade or commerce." Additionally, "every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce" is illegal. Ore. Rev. Stat. § 646.725.

436.    An action may be brought "regardless of whether the plaintiff dealt directly or indirectly with the adverse party." Ore. Rev. Stat. § 646.780(1)(a).

437.    Defendants knew or should have known that their conduct was in violation of Ore. Rev. Stat. §§ 646.705, *et seq.*

438.    Defendants' illegal conduct substantially affected Oregon commerce and consumers.

439.    Plaintiffs' analysis of its Assignors' data identified one or more purchases of Namenda in the State of Oregon.

440.    Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a proximate result of Defendants' unlawful behavior, at a minimum, in the form of increased and unfair prices paid for Namenda as described herein.

441.    Plaintiffs only bring claims for violations under Ore. Rev. Stat. §§ 646.705, *et seq.* occuring after January 1, 2010.

442.    Accordingly, Plaintiffs seek all forms of relief available under Ore. Rev. Stat. §§ 646.705, *et seq.*

**COUNT XIX**
**VIOLATION OF PUERTO RICO ANTITRUST LAW**
**P.R Laws Ann. tit 10 §§ 257, *et seq.***
**(Against All Defendants)**

443.    Plaintiffs re-allege and incorporate herein by reference each of the allegations contained in the preceding paragraphs as if fully set forth herein.

444.    Defendants have intentionally and unlawfully maintained its monopoly power and engaged in a combination and conspiracy in restraint of trade in violation of P.R. Laws Ann. tit 10 §§ 257, *et seq.*

445.    P.R. Laws Ann. tit 10 § 260 makes it illegal to "monopolize, or attempt to

monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce ..." Additionally, "every contract, combination in the form of trust or otherwise, or conspiracy in unreasonable restraint of trade or commerce" is illegal. P.R. Laws Ann. tit 10 § 258.

446.    Defendants knew or should have known that their conduct was in violation of P.R. Laws Ann. tit 10 §§ 257, *et seq*.

447.    Plaintiffs and Defendants are "persons" within the meaning of P.R. Laws Ann. tit 10 § 257.

448.    Defendants' illegal conduct substantially affected Puerto Rico commerce and consumers.

449.    Plaintiffs' analysis of its Assignors' data identified one or more purchases of Namenda in Puerto Rico.

450.    Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a proximate result of Defendants' unlawful behavior, at a minimum, in the form of increased and unfair prices paid for Namenda as described herein.

451.    Accordingly, Plaintiffs seek all forms of relief available under P.R. Laws Ann. tit 10 §§ 257, *et seq*.

## COUNT XX
### VIOLATION OF RHODE ISLAND ANTITRUST LAW
### R.I. Gen. Laws §§ 6-36-1, *et seq*.
### (Against All Defendants)

452.    Plaintiffs re-allege and incorporate herein by reference each of the allegations contained in the preceding paragraphs as if fully set forth herein.

453.    Defendants have intentionally and unlawfully maintained its monopoly power and engaged in a combination and conspiracy in restraint of trade in violation of R.I. Gen. Laws §§ 6-

36-1, *et seq.* ("Rhode Island Antitrust Act").

454.    The Rhode Island Antitrust Act makes unlawful "the establishment, maintenance, or use of a monopoly, or an attempt to establish a monopoly, of trade or commerce by any person, for the purpose of excluding competition or controlling, fixing, or maintaining prices ..." R.I. Gen. Laws § 6-36-5. Additionally, "every contract, combination, or conspiracy in restraint of, or to monopolize, trade or commerce" is unlawful. R.I. Gen. Laws § 6-36-4.

455.    Plaintiffs and Defendants are "persons" within the meaning of R.I. Gen. Laws § 6-36-3.

456.    The fact that a person "has not dealt directly with the defendant shall not bar or otherwise limit recovery." R.I. Gen. Laws § 6-36-7(d).

457.    Defendants knew or should have known that their conduct was in violation of the Rhode Island Antitrust Act.

458.    Defendants' illegal conduct substantially affected Rhode Island commerce and consumers.

459.    Plaintiffs' analysis of its Assignors' data identified one or more purchases of Namenda in the State of Rhode Island.

460.    Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a proximate result of Defendants' unlawful behavior, at a minimum, in the form of increased and unfair prices paid for Namenda as described herein.

461.    Plaintiffs only bring claims for violations under the Rhode Island Antitrust Act occuring after July 15, 2013.

462.    Simultaneously with the filing of this Complaint, Plaintiffs will serve a copy on the Attorney General pursuant to R.I. Gen. Laws Ann. § 6-36-21.

463.    Accordingly, Plaintiffs seek all forms of relief available under the Rhode Island Antitrust Act, R.I. Gen. Laws §§ 6-36-1, *et seq.*

**COUNT XXI**
**VIOLATION OF SOUTH DAKOTA ANTITRUST LAW**
**S.D. Codified Laws §§ 37-1-1, *et seq.***
**(Against All Defendants)**

464.    Plaintiffs re-allege and incorporate herein by reference each of the allegations contained in the preceding paragraphs as if fully set forth herein.

465.    Defendants have intentionally and unlawfully maintained its monopoly power and engaged in a combination and conspiracy in restraint of trade in violation of S.D. Codified Laws §§ 37-1-1, *et seq.*

466.    S.D. Codified Laws § 37-1-3.2. makes unlawful "the monopolization by any person, or an attempt to monopolize, or combine, or conspire with any other person or persons, to monopolize any of the trade or commerce." Additionally, "a contract, combination, or conspiracy between two or more persons in restraint of trade or commerce" is unlawful. S.D. Codified Laws § 37-1-3.1.

467.    Plaintiffs and Defendants are "persons" within the meaning of S.D. Codified Laws § 37-1-3.1.

468.    No person "who is injured directly or indirectly" may be denied the right to bring this action. S.D. Codified Laws § 37-1-33.

469.    Defendants knew or should have known that their conduct was in violation of S.D. Codified Laws §§ 37-1-1, *et seq.*

470.    Defendants' illegal conduct substantially affected South Dakota commerce and consumers.

471.    Plaintiffs' analysis of its Assignors' data identified one or more purchases of

Namenda in the State of South Dakota.

472.    Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a proximate result of Defendants' unlawful behavior, at a minimum, in the form of increased and unfair prices paid for Namenda as described herein.

473.    Accordingly, Plaintiffs seek all forms of relief available under S.D. Codified Laws §§ 37-1-1, *et seq.*

## COUNT XXII
### VIOLATION OF TENNESSEE ANTITRUST LAW
### Tenn. Code Ann. §§ 47-25-101, *et seq.*
### (Against All Defendants)

474.    Plaintiffs re-allege and incorporate herein by reference each of the allegations contained in the preceding paragraphs as if fully set forth herein.

475.    Defendants have intentionally and unlawfully maintained its monopoly power and engaged in a combination and conspiracy in restraint of trade in violation of Tenn. Code Ann. §§ 47-25-101, *et seq.*

476.    Tenn. Code Ann. § 47-25-101 declares "all arrangements, contracts, agreements, trusts, or combinations between persons or corporations made with a view to lessen, or which tend to lessen, full and free competition" against public policy, unlawful, and void.

477.    Defendants knew or should have known that their conduct was in violation of Tenn. Code Ann. §§ 47-25-101, *et seq.*

478.    Defendants' illegal conduct substantially affected Tennessee commerce and consumers.

479.    Plaintiffs' analysis of its Assignors' data identified one or more purchases of Namenda in the State of Tennessee.

480.    Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a

proximate result of Defendants' unlawful behavior, at a minimum, in the form of increased and unfair prices paid for Namenda as described herein.

481.    Accordingly, Plaintiffs seek all forms of relief available under Tenn. Code Ann. §§ 47-25-101, *et seq.*

<b><u>COUNT XXIII</u></b><br>
<b>VIOLATION OF VERMONT ANTITRUST LAW</b><br>
<b>Vt. Stat. Ann. tit 9 §§ 2453, <i>et seq</i>.</b><br>
<b>(Against All Defendants)</b>

482.    Plaintiffs re-allege and incorporate herein by reference each of the allegations contained in the preceding paragraphs as if fully set forth herein.

483.    Defendants have intentionally and unlawfully maintained its monopoly power and engaged in a combination and conspiracy in restraint of trade in violation of Vt. Stat. Ann. tit. 9 §§ 2453, *et seq.*

484.    Vt. Stat. Ann. tit. 9 § 2453 makes "unfair methods of competition in commerce" unlawful.

485.    The fact that a person "has not dealt directly with a defendant shall not bar or otherwise limit recovery." Vt. Stat. Ann tit. 9 § 2465.

486.    Defendants knew or should have known that their conduct was in violation of Vt. Stat. Ann. tit. 9 §§ 2453, *et seq.*

487.    Defendants' illegal conduct substantially affected Vermont commerce and consumers.

488.    Plaintiffs' analysis of its Assignors' data identified one or more purchases of Namenda in the State of Vermont.

489.    Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a proximate result of Defendants' unlawful behavior, at a minimum, in the form of increased and

93

unfair prices paid for Namenda as described herein.

490.    Accordingly, Plaintiffs seek all forms of relief available under Vt. Stat. Ann. tit. 9

§§ 2453, *et seq.*

## COUNT XXIV
### VIOLATION OF WEST VIRGINIA ANTITRUST LAW
### W. Va. Code Ann. §§ 47-18-1, *et seq.*
### (Against All Defendants)

491.    Plaintiffs re-allege and incorporate herein by reference each of the allegations

contained in the preceding paragraphs as if fully set forth herein.

492.    Defendants have intentionally and unlawfully maintained its monopoly power and

engaged in a combination and conspiracy in restraint of trade in violation of W. Va. Code Ann. §§

47-18-1, *et seq.* ("West Virginia Antitrust Act").

493.    The West Virginia Antitrust Act makes unlawful "the establishment, maintenance

or use of a monopoly or an attempt to establish a monopoly of trade or commerce … by any persons

for the purpose of excluding competition or controlling, fixing or maintaining prices ..." W. Va.

Code Ann. § 47-18-4. Additionally, "every contract, combination in the form of trust or otherwise,

or conspiracy in restraint of trade or commerce" is unlawful. W. Va. Code Ann § 47-18-3(a).

494.    Plaintiffs and Defendants are "persons" within the meaning of W. Va. Code Ann.

§ 47-18-2.

495.    Defendants knew or should have known that their conduct was in violation of the

West Virginia Antitrust Act.

496.    Defendants' illegal conduct substantially affected West Virginia commerce and

consumers.

497.    Plaintiffs' analysis of its Assignors' data identified one or more purchases of

Namenda in the State of West Virginia.

498.    Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a proximate result of Defendants' unlawful behavior, at a minimum, in the form of increased and unfair prices paid for Namenda as described herein.

499.    Accordingly, Plaintiffs seek all forms of relief available under the West Virginia Antitrust Act, W. Va. Code Ann. §§ 47-18-1, *et seq*.

**COUNT XXV**
**VIOLATION OF WISCONSIN ANTITRUST LAW**
**Wis. Stat. Ann. §§ 133.01, *et seq*.**
**(Against All Defendants)**

500.    Plaintiffs re-allege and incorporate herein by reference each of the allegations contained in the preceding paragraphs as if fully set forth herein.

501.    Defendants have intentionally and unlawfully maintained its monopoly power and engaged in a combination and conspiracy in restraint of trade in violation of Wis. Stat. Ann. §§ 133.01, *et seq*.

502.    Wis. Stat. Ann. § 133.03 makes it unlawful to monopolize, attempt to monopolize, or combine or conspire with any other person to monopolize any part of trade. Additionally, "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce" is illegal. *Id.*

503.    Plaintiffs and Defendants are "persons" within the meaning of Wis. Stat. Ann. § 133.02.

504.    Any person who is injured "directly or indirectly" may bring suit. Wis. Stat. Ann. § 133.18.

505.    Defendants knew or should have known that their conduct was in violation of Wis. Stat. Ann. §§ 133.01, *et seq*.

506.    Defendants' illegal conduct substantially affected Wisconsin commerce and

consumers.

507.    Plaintiffs' analysis of its Assignors' data identified one or more purchases of Namenda in the State of Wisconsin.

508.    Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a proximate result of Defendants' unlawful behavior, at a minimum, in the form of increased and unfair prices paid for Namenda as described herein.

509.    Accordingly, Plaintiffs seek all forms of relief available under Wis. Stat. Ann. §§ 133.01, *et seq*.

### **VIOLATIONS OF STATE CONSUMER PROTECTION STATUTES**

510.    The following allegations apply to all of Plaintiffs' state law consumer protection claims.

511.    At all relevant times, Defendants engaged in unfair competition or unfair acts or unconscionable acts or practices in violation of the below state consumer protection statutes.

512.    There was a gross disparity between the price that Plaintiffs' Assignors paid for brand-name Namenda and the value received, given that a less expensive substitute generic product should have been available.

513.    As a direct and proximate result of Defendants' unfair competition, unfair or unconscionable acts or practices in violation of the state consumer protection statutes below, Plaintiffs' Assignors were deprived of the opportunity to purchase a generic version of Namenda IR and were forced to pay higher prices for Namenda XR.

### **COUNT XXVI**
**VIOLATION OF FLORIDA CONSUMER PROTECTION LAW**
**Fla. Stat. §§ 501.201, *et seq*.**
**(Against All Defendants)**

514.    Plaintiffs re-allege and incorporate herein by reference each of the allegations

contained in the preceding paragraphs as if fully set forth herein.

515.     Plaintiffs are "interested persons" and "consumers" within the meaning of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. Ann. § 501.203(6)-(7).

516.     Defendants are engaged in "trade or commerce" within the meaning of Fla. Stat. Ann. § 501.203(8).

517.     FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce[.]" Fla. Sta. § 501.204(1).

518.     Defendants' conduct with respect to Namenda constitutes "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices" under FDUTPA.

519.     Defendants knew or should have known that their conduct was in violation of FDUTPA.

520.     Defendants' illegal conduct substantially afffected Florida commerce and consumers.

521.     Plaintiffs' analysis of its Assignors' data identified one or more purchases of Namenda in the State of Florida.

522.     Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a direct and proximate result of Defendants' unfair competition or unfair acts or unconsionable acts or practices in the form of increased and unfair prices paid for Namenda as described herein.

523.     Accordingly, Plaintiffs seek all forms of relief available under FDUTPA, Fla. Stat. §§ 501.201, *et seq*.

**COUNT XXVII**
**VIOLATION OF MASSACHUSETTS CONSUMER PROTECTION LAW**
**Mass. Gen. Laws Ch. 93a §§ 1, *et seq*.**
**(Against All Defendants)**

524.    Plaintiffs re-allege and incorporate herein by reference each of the allegations contained in the preceding paragraphs as if fully set forth herein.

525.    Plaintiffs and Defendants are "persons" within the meaning of the Massachusetts Regulation of Business Practice & Consumer Protection Act ("Massachusetts CPA"), Mass. Gen. Laws ch. 93A, § 1(a).

526.    Defendants are engaged in "trade or commerce" within the meaning of Mass. Gen. Laws ch. 93A, § 1(b).

527.    The Massachusetts CPA makes unfair methods of competition in the conduct of any trade or commerce unlawful. Mass. Gen. Laws Ann. ch. 93A, § 2(a).

528.    Defendants' conduct with respect to Namenda constitutes unfair methods of competition under the Massachusetts CPA.

529.    Defendants knew or should have known that their conduct was in violation of the Massachusetts CPA.

530.    Defendants' illegal conduct substantially afffected Massachusetts commerce and consumers.

531.    Plaintiffs' analysis of its Assignors' data identified one or more purchases of Namenda in the State of Massachusetts.

532.    Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a direct and proximate result of Defendants' unfair competition or unfair acts or unconsionable acts or practices in the form of increased and unfair prices paid for Namenda as described herein.

533.    Accordingly, Plaintiffs seek all forms of relief available under the Massachusetts

CPA, Mass. Gen. Laws Ch. 93a §§ 1, *et seq.*

## COUNT XXVIII
## VIOLATION OF MICHIGAN CONSUMER PROTECTION LAW
### Mich. Comp. Laws §§ 445.903, *et seq.*
### (Against All Defendants)

534.    Plaintiffs re-allege and incorporate herein by reference each of the allegations contained in the preceding paragraphs as if fully set forth herein.

535.    Plaintiffs and Defendants are "persons" within the meaning of the Michigan Consumer Protection Act ("Michigan CPA"), Mich. Comp. Laws § 445.902(1)(d).

536.    Defendants engaged in "trade or commerce" within the meaning of Mich. Comp. Laws § 445.902(1)(d) and (g).

537.    The Michigan CPA prohibits "[u]nfair, unconscionable ... acts, or practices in the conduct of trade or commerce ..." Mich. Comp. Laws § 445.903(1).

538.    Defendants' conduct with respect to Namenda constitutes unfair and/or unconscionable acts or practices under the Michigan CPA.

539.    Defendants knew or should have known that their conduct was in violation of the Michigan CPA.

540.    Defendants' illegal conduct substantially afffected Michigan commerce and consumers.

541.    Plaintiffs' analysis of its Assignors' data identified one or more purchases of Namenda in the State of Michigan.

542.    Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a direct and proximate result of Defendants' unfair competition or unfair acts or unconsionable acts or practices in the form of increased and unfair prices paid for Namenda as described herein.

543.    Accordingly, Plaintiffs seek all forms of relief available under the Michigan CPA,

Mich. Comp. Laws §§ 445.903, *et seq.*

**COUNT XXIX**
**VIOLATION OF NEBRASKA CONSUMER PROTECTION LAW**
**Neb. Rev. Stat. §§ 59-1601, *et seq.***
**(Against All Defendants)**

544.    Plaintiffs re-allege and incorporate herein by reference each of the allegations contained in the preceding paragraphs as if fully set forth herein.

545.    Plaintiffs and Defendants are "persons" within the meaning of the Nebraska Consumer Protection Act ("Nebraska CPA"), Neb. Rev. Stat. § 59-1601(1).

546.    Defendants' actions occurred in the conduct of "trade or commerce" as defined under Neb. Rev. Stat. § 59-1601(2).

547.    The Nebraska CPA provides that "[u]nfair methods of competition ... in the conduct of any trade or commerce shall be unlawful." Neb. Rev. Stat. § 59-1602.

548.    Defendants' conduct with respect to Namenda constitutes "unfair methods of competition" in violation of the Nebraska CPA.

549.    Defendants knew or should have known that their conduct was in violation of the Nebraska CPA.

550.    Defendants' illegal conduct substantially afffected Nebraska commerce and consumers.

551.    Plaintiffs' analysis of its Assignors' data identified one or more purchases of Namenda in the State of Nebraska.

552.    Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a direct and proximate result of Defendants' unfair competition or unfair acts or unconsionable acts or practices in the form of increased and unfair prices paid for Namenda as described herein.

553.    Accordingly, Plaintiffs seek all forms of relief available under the Nebraska CPA,

Neb. Rev. Stat. §§ 59-1601, *et seq.*

**COUNT XXX**
**VIOLATION OF NEVADA CONSUMER PROTECTION LAW**
**Nev. Rev. Stat. §§ 598.0903, *et seq.***
**(Against All Defendants)**

554.    Plaintiffs re-allege and incorporate herein by reference each of the allegations contained in the preceding paragraphs as if fully set forth herein.

555.    The Nevada Deceptive Trade Practices Act ("Nevada DTPA") prohibits deceptive trade practices. The statute provides that a person engages in a "deceptive trade practice" if, in the course of business or occupation, the person knowingly: "[v]iolates a state or federal statute or regulation in connection with the sale or lease of goods or services." Nev. Rev. Stat. § 598.0923(3).

556.    Defendants conduct relating to the Namenda involved knowingly violating the Nevada Unfair Trade Practices Act, Nev. Rev. Stat. Ann. §§ 598A.010, *et seq.*

557.    Defendants knew or should have known that their conduct was in violation of the Nevada DTPA.

558.    Defendants' illegal conduct substantially afffected Nevada commerce and consumers.

559.    Plaintiffs' analysis of its Assignors' data identified one or more purchases of Namenda in the State of Nevada.

560.    Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a direct and proximate result of Defendants' unfair competition or unfair acts or unconsionable acts or practices in the form of increased and unfair prices paid for Namenda as described herein.

561.    Accordingly, Plaintiffs seek all forms of relief available under the Nevada DTPA, Nev. Rev. Stat. §§ 598.0903, *et seq.*

**COUNT XXXI**
**VIOLATION OF NEW HAMPSHIRE CONSUMER PROTECTION LAW**
**N.H. Rev. Stat. Ann. §§ 358-A:1, *et seq*.**
**(Against All Defendants)**

562.    Plaintiffs re-allege and incorporate herein by reference each of the allegations contained in the preceding paragraphs as if fully set forth herein.

563.    Plaintiffs and Defendants are "persons" under the New Hampshire Consumer Protection Act ("New Hampshire CPA"), N.H. Rev. Stat. § 358-A:1.

564.    Defendants' actions occurred in the conduct of "trade or commerce" as defined under N.H. Rev. Stat. § 358-A:1.

565.    The New Hampshire CPA declares "any unfair method of competition" unlawful. N.H. Rev. Stat. § 358-A:2.

566.    Defendants' conduct with respect to Namenda constitutes "unfair method of competition" under the New Hampshire CPA.

567.    Defendants knew or should have known that their conduct was in violation of the New Hampshire CPA.

568.    Defendants' illegal conduct substantially afffected New Hampshire commerce and consumers.

569.    Plaintiffs' analysis of its Assignors' data identified one or more purchases of Namenda in the State of New Hampshire.

570.    Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a direct and proximate result of Defendants' unfair competition or unfair acts or unconsionable acts or practices in the form of increased and unfair prices paid for Namenda as described herein.

571.    Accordingly, Plaintiffs seek all forms of relief available under the New Hampshire CPA, N.H. Rev. Stat. Ann. §§ 358-A:1, *et seq.*

**COUNT XXXII**
**VIOLATION OF NEW MEXICO CONSUMER PROTECTION LAW**
**N.M. Stat. Ann. §§ 57-12-1, *et seq*.**
**(Against All Defendants)**

572.    Plaintiffs re-allege and incorporate herein by reference each of the allegations contained in the preceding paragraphs as if fully set forth herein.

573.    Plaintiffs and Defendants are "persons" within the meaning of the New Mexico Unfair Trade Practices Act ("New Mexico UTPA"), N.M. Stat. Ann. § 57-12-2.

574.    Defendants actions occurred in the conduct of "trade or commerce" as defined under N.M. Stat. Ann. § 57-12-2.

575.    The New Mexico UTPA makes unlawful "unconscionable trade practices" which includes those that "result[] in a gross disparity between the value received by a person and the price paid." N.M. Stat. Ann. § 57-12-2(E)(2).

576.    Defendants' conduct with respect to Namenda constitutes "unconscionable trade practices " under the New Mexico UTPA.

577.    Defendants knew or should have known that their conduct was in violation of the New Mexico UTPA.

578.    Defendants' illegal conduct substantially afffected New Mexico commerce and consumers.

579.    Plaintiffs' analysis of its Assignors' data identified one or more purchases of Namenda in the State of New Mexico.

580.    Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a direct and proximate result of Defendants' unfair competition or unfair acts or unconsionable acts or practices in the form of increased and unfair prices paid for Namenda as described herein.

581.    Accordingly, Plaintiffs seek all forms of relief available under the New Mexico

UTPA, N.M. Stat. Ann. §§ 57-12-1, *et seq*.

### COUNT XXXIII
### VIOLATION OF SOUTH CAROLINA CONSUMER PROTECTION LAW
### S.C. Code Ann. §§ 39-5-10, *et seq*.
### (Against All Defendants)

582.    Plaintiffs re-allege and incorporate herein by reference each of the allegations contained in the preceding paragraphs as if fully set forth herein.

583.    Plaintiffs and Defendants are "persons" within the meaning of the South Carolina Unfair Trade Practices Act ("South Carolina UTPA"), S.C. Code Ann. § 39-5-10(a).

584.    Defendants are engaged in "trade or commerce" within the meaning of S.C. Code Ann. § 39-5-10(b).

585.    The South Carolina UTPA prohibits "unfair methods of competition." S.C. Code Ann. § 39-5-20.

586.    Defendants' conduct with respect to Namenda constitutes "unfair methods of competition" under the South Carolina UTPA.

587.    Defendants knew or should have known that their conduct was in violation of the South Carolina UTPA.

588.    Defendants' illegal conduct substantially afffected South Carolina commerce and consumers.

589.    Plaintiffs' analysis of its Assignors' data identified one or more purchases of Namenda in the State of South Carolina.

590.    Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a direct and proximate result of Defendants' unfair competition or unfair acts or unconsionable acts or practices in the form of increased and unfair prices paid for Namenda as described herein.

591.    Accordingly, Plaintiffs seek all forms of relief available under the South Carolina

UTPA, S.C. Code Ann. §§ 39-5-10, *et seq*.

## COUNT XXXIV
## VIOLATION OF UTAH CONSUMER PROTECTION LAW
### Utah Code Ann. §§ 13-11-1, *et seq*.
### (Against All Defendants)

592.    Plaintiffs re-allege and incorporate herein by reference each of the allegations contained in the preceding paragraphs as if fully set forth herein.

593.    Plaintiffs and Defendants are "persons" within the meaning of the Utah Consumer Sales Practices Act ("Utah CSPA"), Utah Code Ann. § 13-11-3(5).

594.    The purchase of Namenda is a "consumer transaction" within the meaning of Utah Code Ann. § 13-11-3(2).

595.    Utah CSPA prohibits "unconscionable act[s] or practice[s]" Utah Code Ann. § 13-11-5.

596.    Defendants' conduct with respect to Namenda constitutes unconscionable acts or practices under the Utah CSPA.

597.    Defendants knew or should have known that their conduct was in violation of the Utah CSPA.

598.    Defendants' illegal conduct substantially afffected Utah commerce and consumers.

599.    Plaintiffs' analysis of its Assignors' data identified one or more purchases of Namenda in the State of Utah.

600.    Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a direct and proximate result of Defendants' unfair competition or unfair acts or unconsionable acts or practices in the form of increased and unfair prices paid for Namenda as described herein.

601.    Accordingly, Plaintiffs seek all forms of relief available under the Utah CSPA, Utah Code Ann. §§ 13-11-1, *et seq*.

## UNJUST ENRICHMENT

602.    Defendants have benefited from the overcharges on sales of Namenda IR and Namenda XR made possible by the unlawful and inequitable acts alleged in this Complaint.

603.    Defendants' financial benefits are traceable to Plaintiffs' Assignors' overpayments for Namenda IR and Namenda XR.

604.    Plaintiffs' Assignors have conferred an economic benefit upon the Defendants in the nature of profits resulting from unlawful overcharges, to the economic detriment of Plaintiffs' Assignors.

605.    It would be futile for Plaintiffs' Assignors to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which they indirectly purchased Namenda IR and Namenda XR, as those intermediaries are not liable and would not compensate Plaintiffs' Assignors for Defendants' unlawful conduct.

606.    The economic benefit Defendants derived from charging monopolistic and artificially inflated prices for Namenda IR and Namenda XR is a direct and proximate result of Defendants' unlawful practices.

607.    The financial benefits Defendants derived rightfully belong to Plaintiffs' Assignors who paid anticompetitive prices that inured to Defendants' benefit.

608.    It would be inequitable under the unjust enrichment principles under the laws of the below states for Defendants to retain any of the overcharges Plaintiffs' Assignors paid for Namenda IR and Namenda XR that were derived from Defendants' unlawful conduct.

609.    Defendants are aware of and appreciate the benefits bestowed upon them by Plaintiffs' Assignors.

## COUNT XXXVI
## ALABAMA UNJUST ENRICHMENT
### (Against Forest and Merz)

610.    Plaintiffs re-allege and incorporate herein by reference each of the allegations contained in the preceding paragraphs as if fully set forth herein.

611.    Plaintiffs' Assignors conferred a benefit on the Defendants by purchasing Namenda from Defendants at artificially and illegally inflated prices as a result of Defendants' unlawful behavior.

612.    Defendants received and unjustly retained the benefits from the Plaintiffs' Assignors, in the form of costs paid, to Plaintiffs' Assignors' detriment.

613.    Defendants have not compensated Plaintiffs for the receipt of the benefits conferred by Plaintiffs' Assignors.

614.    Defendants' retention of these benefits without first paying the value thereof to the Plaintiffs' Assignors violates the fundamental principles of justice, equity, and good conscience.

615.    Defendants knowingly accepted the unjust benefits of its unlawful conduct.

616.    Defendants have unfairly and unjustly profited from their unlawful conduct.

617.    As a result of Defendants' misconduct, the amount of their unjust enrichment should be disgorged and returned to Plaintiffs, in an amount to be proven at trial.

## COUNT XXXVII
## ARIZONA UNJUST ENRICHMENT
### (Against Forest and Merz)

618.    Plaintiffs re-allege and incorporate herein by reference each of the allegations contained in the preceding paragraphs as if fully set forth herein.

619.    Plaintiffs' Assignors conferred a benefit on the Defendants by purchasing Namenda from Defendants at artificially and illegally inflated prices as a result of Defendants' unlawful behavior.

620.    Defendants received and unjustly retained the benefits from the Plaintiffs' Assignors, in the form of costs paid, to Plaintiffs' Assignors' detriment.

621.    Defendants have not compensated Plaintiffs for the receipt of the benefits conferred by Plaintiffs' Assignors.

622.    Defendants' retention of these benefits without first paying the value thereof to the Plaintiffs' Assignors violates the fundamental principles of justice, equity, and good conscience.

623.    Defendants knowingly accepted the unjust benefits of its unlawful conduct.

624.    Defendants have unfairly and unjustly profited from their unlawful conduct.

625.    As a result of Defendants' misconduct, the amount of their unjust enrichment should be disgorged and returned to Plaintiffs, in an amount to be proven at trial.

**COUNT XXXVIII**
**ARKANSAS UNJUST ENRICHMENT**
**(Against Forest and Merz)**

626.    Plaintiffs re-allege and incorporate herein by reference each of the allegations contained in the preceding paragraphs as if fully set forth herein.

627.    Plaintiffs' Assignors conferred a benefit on the Defendants by purchasing Namenda from Defendants at artificially and illegally inflated prices as a result of Defendants' unlawful behavior.

628.    Defendants received and unjustly retained the benefits from the Plaintiffs' Assignors, in the form of costs paid, to Plaintiffs' Assignors' detriment.

629.     Defendants have not compensated Plaintiffs for the receipt of the benefits conferred by Plaintiffs' Assignors.

630.     Defendants' retention of these benefits without first paying the value thereof to the Plaintiffs' Assignors violates the fundamental principles of justice, equity, and good conscience.

631.     Defendants knowingly accepted the unjust benefits of its unlawful conduct.

632.     Defendants have unfairly and unjustly profited from their unlawful conduct.

633.     As a result of Defendants' misconduct, the amount of their unjust enrichment should be disgorged and returned to Plaintiffs, in an amount to be proven at trial.

## COUNT XXXIX
## CALIFORNIA UNJUST ENRICHMENT
### (Against Forest and Merz)

634.     Plaintiffs re-allege and incorporate herein by reference each of the allegations contained in the preceding paragraphs as if fully set forth herein.

635.     Plaintiffs' Assignors conferred a benefit on the Defendants by purchasing Namenda from Defendants at artificially and illegally inflated prices as a result of Defendants' unlawful behavior.

636.     Defendants received and unjustly retained the benefits from the Plaintiffs' Assignors, in the form of costs paid, to Plaintiffs' Assignors' detriment.

637.     Defendants have not compensated Plaintiffs for the receipt of the benefits conferred by Plaintiffs' Assignors.

638.     Defendants' retention of these benefits without first paying the value thereof to the Plaintiffs' Assignors violates the fundamental principles of justice, equity, and good conscience.

639.     Defendants knowingly accepted the unjust benefits of its unlawful conduct.

640.     Defendants have unfairly and unjustly profited from their unlawful conduct.

641.    As a result of Defendants' misconduct, the amount of their unjust enrichment should be disgorged and returned to Plaintiffs, in an amount to be proven at trial.

## COUNT XL
### DISTRICT OF COLUMBIA UNJUST ENRICHMENT
### (Against Forest and Merz)

642.    Plaintiffs re-allege and incorporate herein by reference each of the allegations contained in the preceding paragraphs as if fully set forth herein.

643.    Plaintiffs' Assignors conferred a benefit on the Defendants by purchasing Namenda from Defendants at artificially and illegally inflated prices as a result of Defendants' unlawful behavior.

644.    Defendants received and unjustly retained the benefits from the Plaintiffs' Assignors, in the form of costs paid, to Plaintiffs' Assignors' detriment.

645.    Defendants have not compensated Plaintiffs for the receipt of the benefits conferred by Plaintiffs' Assignors.

646.    Defendants' retention of these benefits without first paying the value thereof to the Plaintiffs' Assignors violates the fundamental principles of justice, equity, and good conscience.

647.    Defendants knowingly accepted the unjust benefits of its unlawful conduct.

648.    Defendants have unfairly and unjustly profited from their unlawful conduct.

649.    As a result of Defendants' misconduct, the amount of their unjust enrichment should be disgorged and returned to Plaintiffs, in an amount to be proven at trial.

## COUNT XLI
### FLORIDA UNJUST ENRICHMENT
### (Against Forest and Merz)

650.    Plaintiffs re-allege and incorporate herein by reference each of the allegations contained in the preceding paragraphs as if fully set forth herein.

651.     Plaintiffs' Assignors conferred a benefit on the Defendants by purchasing Namenda from Defendants at artificially and illegally inflated prices as a result of Defendants' unlawful behavior.

652.     Defendants received and unjustly retained the benefits from the Plaintiffs' Assignors, in the form of costs paid, to Plaintiffs' Assignors' detriment.

653.     Defendants have not compensated Plaintiffs for the receipt of the benefits conferred by Plaintiffs' Assignors.

654.     Defendants' retention of these benefits without first paying the value thereof to the Plaintiffs' Assignors violates the fundamental principles of justice, equity, and good conscience.

655.     Defendants knowingly accepted the unjust benefits of its unlawful conduct.

656.     Defendants have unfairly and unjustly profited from their unlawful conduct.

657.     As a result of Defendants' misconduct, the amount of their unjust enrichment should be disgorged and returned to Plaintiffs, in an amount to be proven at trial.

<u>**COUNT XLII**</u>
**ILLINOIS <u>UNJUST ENRICHMENT</u>**
**(Against Forest and Merz)**

658.     Plaintiffs re-allege and incorporate herein by reference each of the allegations contained in the preceding paragraphs as if fully set forth herein.

659.     Plaintiffs' Assignors conferred a benefit on the Defendants by purchasing Namenda from Defendants at artificially and illegally inflated prices as a result of Defendants' unlawful behavior.

660.     Defendants received and unjustly retained the benefits from the Plaintiffs' Assignors, in the form of costs paid, to Plaintiffs' Assignors' detriment.

661.    Defendants have not compensated Plaintiffs for the receipt of the benefits conferred by Plaintiffs' Assignors.

662.    Defendants' retention of these benefits without first paying the value thereof to the Plaintiffs' Assignors violates the fundamental principles of justice, equity, and good conscience.

663.    Defendants knowingly accepted the unjust benefits of its unlawful conduct.

664.    Defendants have unfairly and unjustly profited from their unlawful conduct.

665.    As a result of Defendants' misconduct, the amount of their unjust enrichment should be disgorged and returned to Plaintiffs, in an amount to be proven at trial.

**COUNT XLIII**
**IOWA UNJUST ENRICHMENT**
**(Against Forest and Merz)**

666.    Plaintiffs re-allege and incorporate herein by reference each of the allegations contained in the preceding paragraphs as if fully set forth herein.

667.    Plaintiffs' Assignors conferred a benefit on the Defendants by purchasing Namenda from Defendants at artificially and illegally inflated prices as a result of Defendants' unlawful behavior.

668.    Defendants received and unjustly retained the benefits from the Plaintiffs' Assignors, in the form of costs paid, to Plaintiffs' Assignors' detriment.

669.    Defendants have not compensated Plaintiffs for the receipt of the benefits conferred by Plaintiffs' Assignors.

670.    Defendants' retention of these benefits without first paying the value thereof to the Plaintiffs' Assignors violates the fundamental principles of justice, equity, and good conscience.

671.    Defendants knowingly accepted the unjust benefits of its unlawful conduct.

672.    Defendants have unfairly and unjustly profited from their unlawful conduct.

**673.**    As a result of Defendants' misconduct, the amount of their unjust enrichment should be disgorged and returned to Plaintiffs, in an amount to be proven at trial.

**COUNT XLIV**
**KANSAS UNJUST ENRICHMENT**
**(Against Forest and Merz)**

674.    Plaintiffs re-allege and incorporate herein by reference each of the allegations contained in the preceding paragraphs as if fully set forth herein.

675.    Plaintiffs' Assignors conferred a benefit on the Defendants by purchasing Namenda from Defendants at artificially and illegally inflated prices as a result of Defendants' unlawful behavior.

676.    Defendants received and unjustly retained the benefits from the Plaintiffs' Assignors, in the form of costs paid, to Plaintiffs' Assignors' detriment.

677.    Defendants have not compensated Plaintiffs for the receipt of the benefits conferred by Plaintiffs' Assignors.

678.    Defendants' retention of these benefits without first paying the value thereof to the Plaintiffs' Assignors violates the fundamental principles of justice, equity, and good conscience.

679.    Defendants knowingly accepted the unjust benefits of its unlawful conduct.

680.    Defendants have unfairly and unjustly profited from their unlawful conduct.

681.    As a result of Defendants' misconduct, the amount of their unjust enrichment should be disgorged and returned to Plaintiffs, in an amount to be proven at trial.

**COUNT XLV**
**MAINE UNJUST ENRICHMENT**
**(Against Forest and Merz)**

682.    Plaintiffs re-allege and incorporate herein by reference each of the allegations contained in the preceding paragraphs as if fully set forth herein.

683.    Plaintiffs' Assignors conferred a benefit on the Defendants by purchasing Namenda from Defendants at artificially and illegally inflated prices as a result of Defendants' unlawful behavior.

684.    Defendants received and unjustly retained the benefits from the Plaintiffs' Assignors, in the form of costs paid, to Plaintiffs' Assignors' detriment.

685.    Defendants have not compensated Plaintiffs for the receipt of the benefits conferred by Plaintiffs' Assignors.

686.    Defendants' retention of these benefits without first paying the value thereof to the Plaintiffs' Assignors violates the fundamental principles of justice, equity, and good conscience.

687.    Defendants knowingly accepted the unjust benefits of its unlawful conduct.

688.    Defendants have unfairly and unjustly profited from their unlawful conduct.

689.    As a result of Defendants' misconduct, the amount of their unjust enrichment should be disgorged and returned to Plaintiffs, in an amount to be proven at trial.

**COUNT XLVI**
**MASSACHUSETTS UNJUST ENRICHMENT**
**(Against Forest and Merz)**

690.    Plaintiffs re-allege and incorporate herein by reference each of the allegations contained in the preceding paragraphs as if fully set forth herein.

691.    Plaintiffs' Assignors conferred a benefit on the Defendants by purchasing Namenda from Defendants at artificially and illegally inflated prices as a result of Defendants' unlawful behavior.

692.    Defendants received and unjustly retained the benefits from the Plaintiffs' Assignors, in the form of costs paid, to Plaintiffs' Assignors' detriment.

693.    Defendants have not compensated Plaintiffs for the receipt of the benefits conferred by Plaintiffs' Assignors.

694.    Defendants' retention of these benefits without first paying the value thereof to the Plaintiffs' Assignors violates the fundamental principles of justice, equity, and good conscience.

695.    Defendants knowingly accepted the unjust benefits of its unlawful conduct.

696.    Defendants have unfairly and unjustly profited from their unlawful conduct.

697.    As a result of Defendants' misconduct, the amount of their unjust enrichment should be disgorged and returned to Plaintiffs, in an amount to be proven at trial.

### COUNT XLVII
### MINNESOTA UNJUST ENRICHMENT
### (Against Forest and Merz)

698.    Plaintiffs re-allege and incorporate herein by reference each of the allegations contained in the preceding paragraphs as if fully set forth herein.

699.    Plaintiffs' Assignors conferred a benefit on the Defendants by purchasing Namenda from Defendants at artificially and illegally inflated prices as a result of Defendants' unlawful behavior.

700.    Defendants received and unjustly retained the benefits from the Plaintiffs' Assignors, in the form of costs paid, to Plaintiffs' Assignors' detriment.

701.    Defendants have not compensated Plaintiffs for the receipt of the benefits conferred by Plaintiffs' Assignors.

702.    Defendants' retention of these benefits without first paying the value thereof to the Plaintiffs' Assignors violates the fundamental principles of justice, equity, and good conscience.

703.    Defendants knowingly accepted the unjust benefits of its unlawful conduct.

704.    Defendants have unfairly and unjustly profited from their unlawful conduct.

705.     As a result of Defendants' misconduct, the amount of their unjust enrichment should be disgorged and returned to Plaintiffs, in an amount to be proven at trial.

**COUNT XLVIII**
**MISSISSIPPI UNJUST ENRICHMENT**
**(Against Forest and Merz)**

706.     Plaintiffs re-allege and incorporate herein by reference each of the allegations contained in the preceding paragraphs as if fully set forth herein.

707.     Plaintiffs' Assignors conferred a benefit on the Defendants by purchasing Namenda from Defendants at artificially and illegally inflated prices as a result of Defendants' unlawful behavior.

708.     Defendants received and unjustly retained the benefits from the Plaintiffs' Assignors, in the form of costs paid, to Plaintiffs' Assignors' detriment.

709.     Defendants have not compensated Plaintiffs for the receipt of the benefits conferred by Plaintiffs' Assignors.

710.     Defendants' retention of these benefits without first paying the value thereof to the Plaintiffs' Assignors violates the fundamental principles of justice, equity, and good conscience.

711.     Defendants knowingly accepted the unjust benefits of its unlawful conduct.

712.     Defendants have unfairly and unjustly profited from their unlawful conduct.

713.     As a result of Defendants' misconduct, the amount of their unjust enrichment should be disgorged and returned to Plaintiffs, in an amount to be proven at trial.

**COUNT XLIX**
**NEBRASKA UNJUST ENRICHMENT**
**(Against Forest and Merz)**

714.     Plaintiffs re-allege and incorporate herein by reference each of the allegations contained in the preceding paragraphs as if fully set forth herein.

116

715.    Plaintiffs' Assignors conferred a benefit on the Defendants by purchasing Namenda from Defendants at artificially and illegally inflated prices as a result of Defendants' unlawful behavior.

716.    Defendants received and unjustly retained the benefits from the Plaintiffs' Assignors, in the form of costs paid, to Plaintiffs' Assignors' detriment.

717.    Defendants have not compensated Plaintiffs for the receipt of the benefits conferred by Plaintiffs' Assignors.

718.    Defendants' retention of these benefits without first paying the value thereof to the Plaintiffs' Assignors violates the fundamental principles of justice, equity, and good conscience.

719.    Defendants knowingly accepted the unjust benefits of its unlawful conduct.

720.    Defendants have unfairly and unjustly profited from their unlawful conduct.

721.    As a result of Defendants' misconduct, the amount of their unjust enrichment should be disgorged and returned to Plaintiffs, in an amount to be proven at trial.

## COUNT L
## NEVADA UNJUST ENRICHMENT
### (Against Forest and Merz)

722.    Plaintiffs re-allege and incorporate herein by reference each of the allegations contained in the preceding paragraphs as if fully set forth herein.

723.    Plaintiffs' Assignors conferred a benefit on the Defendants by purchasing Namenda from Defendants at artificially and illegally inflated prices as a result of Defendants' unlawful behavior.

724.    Defendants received and unjustly retained the benefits from the Plaintiffs' Assignors, in the form of costs paid, to Plaintiffs' Assignors' detriment.

725.    Defendants have not compensated Plaintiffs for the receipt of the benefits conferred by Plaintiffs' Assignors.

726.    Defendants' retention of these benefits without first paying the value thereof to the Plaintiffs' Assignors violates the fundamental principles of justice, equity, and good conscience.

727.    Defendants knowingly accepted the unjust benefits of its unlawful conduct.

728.    Defendants have unfairly and unjustly profited from their unlawful conduct.

729.    As a result of Defendants' misconduct, the amount of their unjust enrichment should be disgorged and returned to Plaintiffs, in an amount to be proven at trial.

### COUNT LI
### NEW HAMPSHIRE UNJUST ENRICHMENT
### (Against Forest and Merz)

730.    Plaintiffs re-allege and incorporate herein by reference each of the allegations contained in the preceding paragraphs as if fully set forth herein.

731.    Plaintiffs' Assignors conferred a benefit on the Defendants by purchasing Namenda from Defendants at artificially and illegally inflated prices as a result of Defendants' unlawful behavior.

732.    Defendants received and unjustly retained the benefits from the Plaintiffs' Assignors, in the form of costs paid, to Plaintiffs' Assignors' detriment.

733.    Defendants have not compensated Plaintiffs for the receipt of the benefits conferred by Plaintiffs' Assignors.

734.    Defendants' retention of these benefits without first paying the value thereof to the Plaintiffs' Assignors violates the fundamental principles of justice, equity, and good conscience.

735.    Defendants knowingly accepted the unjust benefits of its unlawful conduct.

736.    Defendants have unfairly and unjustly profited from their unlawful conduct.

737.    As a result of Defendants' misconduct, the amount of their unjust enrichment should be disgorged and returned to Plaintiffs, in an amount to be proven at trial.

## COUNT LII
### NEW MEXICO UNJUST ENRICHMENT
**(Against Forest and Merz)**

738.    Plaintiffs re-allege and incorporate herein by reference each of the allegations contained in the preceding paragraphs as if fully set forth herein.

739.    Plaintiffs' Assignors conferred a benefit on the Defendants by purchasing Namenda from Defendants at artificially and illegally inflated prices as a result of Defendants' unlawful behavior.

740.    Defendants received and unjustly retained the benefits from the Plaintiffs' Assignors, in the form of costs paid, to Plaintiffs' Assignors' detriment.

741.    Defendants have not compensated Plaintiffs for the receipt of the benefits conferred by Plaintiffs' Assignors.

742.    Defendants' retention of these benefits without first paying the value thereof to the Plaintiffs' Assignors violates the fundamental principles of justice, equity, and good conscience.

743.    Defendants knowingly accepted the unjust benefits of its unlawful conduct.

744.    Defendants have unfairly and unjustly profited from their unlawful conduct.

745.    As a result of Defendants' misconduct, the amount of their unjust enrichment should be disgorged and returned to Plaintiffs, in an amount to be proven at trial.

## COUNT LIII
### NEW YORK UNJUST ENRICHMENT
**(Against Forest and Merz)**

746.    Plaintiffs re-allege and incorporate herein by reference each of the allegations contained in the preceding paragraphs as if fully set forth herein.

119

747.     Plaintiffs' Assignors conferred a benefit on the Defendants by purchasing Namenda from Defendants at artificially and illegally inflated prices as a result of Defendants' unlawful behavior.

748.     Defendants received and unjustly retained the benefits from the Plaintiffs' Assignors, in the form of costs paid, to Plaintiffs' Assignors' detriment.

749.     Defendants have not compensated Plaintiffs for the receipt of the benefits conferred by Plaintiffs' Assignors.

750.     Defendants' retention of these benefits without first paying the value thereof to the Plaintiffs' Assignors violates the fundamental principles of justice, equity, and good conscience.

751.     Defendants knowingly accepted the unjust benefits of its unlawful conduct.

752.     Defendants have unfairly and unjustly profited from their unlawful conduct.

753.     As a result of Defendants' misconduct, the amount of their unjust enrichment should be disgorged and returned to Plaintiffs, in an amount to be proven at trial.

## COUNT LIV
## NORTH CAROLINA UNJUST ENRICHMENT
### (Against Forest and Merz)

754.     Plaintiffs re-allege and incorporate herein by reference each of the allegations contained in the preceding paragraphs as if fully set forth herein.

755.     Plaintiffs' Assignors conferred a benefit on the Defendants by purchasing Namenda from Defendants at artificially and illegally inflated prices as a result of Defendants' unlawful behavior.

756.     Defendants received and unjustly retained the benefits from the Plaintiffs' Assignors, in the form of costs paid, to Plaintiffs' Assignors' detriment.

757.    Defendants have not compensated Plaintiffs for the receipt of the benefits conferred by Plaintiffs' Assignors.

758.    Defendants' retention of these benefits without first paying the value thereof to the Plaintiffs' Assignors violates the fundamental principles of justice, equity, and good conscience.

759.    Defendants knowingly accepted the unjust benefits of its unlawful conduct.

760.    Defendants have unfairly and unjustly profited from their unlawful conduct.

761.    As a result of Defendants' misconduct, the amount of their unjust enrichment should be disgorged and returned to Plaintiffs, in an amount to be proven at trial.

**COUNT LV**
**OREGON UNJUST ENRICHMENT**
**(Against Forest and Merz)**

762.    Plaintiffs re-allege and incorporate herein by reference each of the allegations contained in the preceding paragraphs as if fully set forth herein.

763.    Plaintiffs' Assignors conferred a benefit on the Defendants by purchasing Namenda from Defendants at artificially and illegally inflated prices as a result of Defendants' unlawful behavior.

764.    Defendants received and unjustly retained the benefits from the Plaintiffs' Assignors, in the form of costs paid, to Plaintiffs' Assignors' detriment.

765.    Defendants have not compensated Plaintiffs for the receipt of the benefits conferred by Plaintiffs' Assignors.

766.    Defendants' retention of these benefits without first paying the value thereof to the Plaintiffs' Assignors violates the fundamental principles of justice, equity, and good conscience.

767.    Defendants knowingly accepted the unjust benefits of its unlawful conduct.

768.    Defendants have unfairly and unjustly profited from their unlawful conduct.

769.    As a result of Defendants' misconduct, the amount of their unjust enrichment should be disgorged and returned to Plaintiffs, in an amount to be proven at trial.

**COUNT LVI**
**PUERTO RICO UNJUST ENRICHMENT**
**(Against Forest and Merz)**

770.    Plaintiffs re-allege and incorporate herein by reference each of the allegations contained in the preceding paragraphs as if fully set forth herein.

771.    Plaintiffs' Assignors conferred a benefit on the Defendants by purchasing Namenda from Defendants at artificially and illegally inflated prices as a result of Defendants' unlawful behavior.

772.    Defendants received and unjustly retained the benefits from the Plaintiffs' Assignors, in the form of costs paid, to Plaintiffs' Assignors' detriment.

773.    Defendants have not compensated Plaintiffs for the receipt of the benefits conferred by Plaintiffs' Assignors.

774.    Defendants' retention of these benefits without first paying the value thereof to the Plaintiffs' Assignors violates the fundamental principles of justice, equity, and good conscience.

775.    Defendants knowingly accepted the unjust benefits of its unlawful conduct.

776.    Defendants have unfairly and unjustly profited from their unlawful conduct.

777.    As a result of Defendants' misconduct, the amount of their unjust enrichment should be disgorged and returned to Plaintiffs, in an amount to be proven at trial.

**COUNT LVII**
**RHODE ISLAND UNJUST ENRICHMENT**
**(Against Forest and Merz)**

778.    Plaintiffs re-allege and incorporate herein by reference each of the allegations contained in the preceding paragraphs as if fully set forth herein.

779.    Plaintiffs' Assignors conferred a benefit on the Defendants by purchasing Namenda from Defendants at artificially and illegally inflated prices as a result of Defendants' unlawful behavior.

780.    Defendants received and unjustly retained the benefits from the Plaintiffs' Assignors, in the form of costs paid, to Plaintiffs' Assignors' detriment.

781.    Defendants have not compensated Plaintiffs for the receipt of the benefits conferred by Plaintiffs' Assignors.

782.    Defendants' retention of these benefits without first paying the value thereof to the Plaintiffs' Assignors violates the fundamental principles of justice, equity, and good conscience.

783.    Defendants knowingly accepted the unjust benefits of its unlawful conduct.

784.    Defendants have unfairly and unjustly profited from their unlawful conduct.

785.    As a result of Defendants' misconduct, the amount of their unjust enrichment should be disgorged and returned to Plaintiffs, in an amount to be proven at trial.

### COUNT LVIII
### SOUTH CAROLINA UNJUST ENRICHMENT
### (Against Forest and Merz)

786.    Plaintiffs re-allege and incorporate herein by reference each of the allegations contained in the preceding paragraphs as if fully set forth herein.

787.    Plaintiffs' Assignors conferred a benefit on the Defendants by purchasing Namenda from Defendants at artificially and illegally inflated prices as a result of Defendants' unlawful behavior.

788.    Defendants received and unjustly retained the benefits from the Plaintiffs' Assignors, in the form of costs paid, to Plaintiffs' Assignors' detriment.

789.    Defendants have not compensated Plaintiffs for the receipt of the benefits conferred by Plaintiffs' Assignors.

790.    Defendants' retention of these benefits without first paying the value thereof to the Plaintiffs' Assignors violates the fundamental principles of justice, equity, and good conscience.

791.    Defendants knowingly accepted the unjust benefits of its unlawful conduct.

792.    Defendants have unfairly and unjustly profited from their unlawful conduct.

793.    As a result of Defendants' misconduct, the amount of their unjust enrichment should be disgorged and returned to Plaintiffs, in an amount to be proven at trial.

## COUNT LIX
### SOUTH DAKOTA UNJUST ENRICHMENT
### (Against Forest and Merz)

794.    Plaintiffs re-allege and incorporate herein by reference each of the allegations contained in the preceding paragraphs as if fully set forth herein.

795.    Plaintiffs' Assignors conferred a benefit on the Defendants by purchasing Namenda from Defendants at artificially and illegally inflated prices as a result of Defendants' unlawful behavior.

796.    Defendants received and unjustly retained the benefits from the Plaintiffs' Assignors, in the form of costs paid, to Plaintiffs' Assignors' detriment.

797.    Defendants have not compensated Plaintiffs for the receipt of the benefits conferred by Plaintiffs' Assignors.

798.    Defendants' retention of these benefits without first paying the value thereof to the Plaintiffs' Assignors violates the fundamental principles of justice, equity, and good conscience.

799.    Defendants knowingly accepted the unjust benefits of its unlawful conduct.

800.    Defendants have unfairly and unjustly profited from their unlawful conduct.

801.   As a result of Defendants' misconduct, the amount of their unjust enrichment should be disgorged and returned to Plaintiffs, in an amount to be proven at trial.

## COUNT LX
## TENNESSEE UNJUST ENRICHMENT
### (Against Forest and Merz)

802.   Plaintiffs re-allege and incorporate herein by reference each of the allegations contained in the preceding paragraphs as if fully set forth herein.

803.   Plaintiffs' Assignors conferred a benefit on the Defendants by purchasing Namenda from Defendants at artificially and illegally inflated prices as a result of Defendants' unlawful behavior.

804.   Defendants received and unjustly retained the benefits from the Plaintiffs' Assignors, in the form of costs paid, to Plaintiffs' Assignors' detriment.

805.   Defendants have not compensated Plaintiffs for the receipt of the benefits conferred by Plaintiffs' Assignors.

806.   Defendants' retention of these benefits without first paying the value thereof to the Plaintiffs' Assignors violates the fundamental principles of justice, equity, and good conscience.

807.   Defendants knowingly accepted the unjust benefits of its unlawful conduct.

808.   Defendants have unfairly and unjustly profited from their unlawful conduct.

809.   As a result of Defendants' misconduct, the amount of their unjust enrichment should be disgorged and returned to Plaintiffs, in an amount to be proven at trial.

## COUNT LXI
## UTAH UNJUST ENRICHMENT
### (Against Forest and Merz)

810.   Plaintiffs re-allege and incorporate herein by reference each of the allegations contained in the preceding paragraphs as if fully set forth herein.

811.    Plaintiffs' Assignors conferred a benefit on the Defendants by purchasing Namenda from Defendants at artificially and illegally inflated prices as a result of Defendants' unlawful behavior.

812.    Defendants received and unjustly retained the benefits from the Plaintiffs' Assignors, in the form of costs paid, to Plaintiffs' Assignors' detriment.

813.    Defendants have not compensated Plaintiffs for the receipt of the benefits conferred by Plaintiffs' Assignors.

814.    Defendants' retention of these benefits without first paying the value thereof to the Plaintiffs' Assignors violates the fundamental principles of justice, equity, and good conscience.

815.    Defendants knowingly accepted the unjust benefits of its unlawful conduct.

816.    Defendants have unfairly and unjustly profited from their unlawful conduct.

817.    As a result of Defendants' misconduct, the amount of their unjust enrichment should be disgorged and returned to Plaintiffs, in an amount to be proven at trial.

**COUNT LXII**
**VERMONT UNJUST ENRICHMENT**
**(Against Forest and Merz)**

818.    Plaintiffs re-allege and incorporate herein by reference each of the allegations contained in the preceding paragraphs as if fully set forth herein.

819.    Plaintiffs' Assignors conferred a benefit on the Defendants by purchasing Namenda from Defendants at artificially and illegally inflated prices as a result of Defendants' unlawful behavior.

820.    Defendants received and unjustly retained the benefits from the Plaintiffs' Assignors, in the form of costs paid, to Plaintiffs' Assignors' detriment.

821.    Defendants have not compensated Plaintiffs for the receipt of the benefits conferred by Plaintiffs' Assignors.

822.    Defendants' retention of these benefits without first paying the value thereof to the Plaintiffs' Assignors violates the fundamental principles of justice, equity, and good conscience.

823.    Defendants knowingly accepted the unjust benefits of its unlawful conduct.

824.    Defendants have unfairly and unjustly profited from their unlawful conduct.

825.    As a result of Defendants' misconduct, the amount of their unjust enrichment should be disgorged and returned to Plaintiffs, in an amount to be proven at trial.

## COUNT LXIII
### WEST VIRGINIA UNJUST ENRICHMENT
### (Against Forest and Merz)

826.    Plaintiffs re-allege and incorporate herein by reference each of the allegations contained in the preceding paragraphs as if fully set forth herein.

827.    Plaintiffs' Assignors conferred a benefit on the Defendants by purchasing Namenda from Defendants at artificially and illegally inflated prices as a result of Defendants' unlawful behavior.

828.    Defendants received and unjustly retained the benefits from the Plaintiffs' Assignors, in the form of costs paid, to Plaintiffs' Assignors' detriment.

829.    Defendants have not compensated Plaintiffs for the receipt of the benefits conferred by Plaintiffs' Assignors.

830.    Defendants' retention of these benefits without first paying the value thereof to the Plaintiffs' Assignors violates the fundamental principles of justice, equity, and good conscience.

831.    Defendants knowingly accepted the unjust benefits of its unlawful conduct.

832.    Defendants have unfairly and unjustly profited from their unlawful conduct.

833.    As a result of Defendants' misconduct, the amount of their unjust enrichment should be disgorged and returned to Plaintiffs, in an amount to be proven at trial.

**COUNT LXIV**
**WISCONSIN UNJUST ENRICHMENT**
**(Against Forest and Merz)**

834.    Plaintiffs re-allege and incorporate herein by reference each of the allegations contained in the preceding paragraphs as if fully set forth herein.

835.    Plaintiffs' Assignors conferred a benefit on the Defendants by purchasing Namenda from Defendants at artificially and illegally inflated prices as a result of Defendants' unlawful behavior.

836.    Defendants received and unjustly retained the benefits from the Plaintiffs' Assignors, in the form of costs paid, to Plaintiffs' Assignors' detriment.

837.    Defendants have not compensated Plaintiffs for the receipt of the benefits conferred by Plaintiffs' Assignors.

838.    Defendants' retention of these benefits without first paying the value thereof to the Plaintiffs' Assignors violates the fundamental principles of justice, equity, and good conscience.

839.    Defendants knowingly accepted the unjust benefits of its unlawful conduct.

840.    Defendants have unfairly and unjustly profited from their unlawful conduct.

841.    As a result of Defendants' misconduct, the amount of their unjust enrichment should be disgorged and returned to Plaintiffs, in an amount to be proven at trial.

**JURY DEMAND**

Plaintiffs demand a trial by jury of all issues so triable in this cause.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for the following relief:

a.  Enter a judgment against Defendants for the violations alleged herein;

b.  Award to Plaintiffs actual damages incurred as a result of the wrongful acts complaint of herein, along with pre-judgment and post-judgment interest at the maximum rate allowed by law;

c.  Award statutory damages set forth herein under the statutory claims alleged;

d.  Award Plaintiffs the costs of this action, including reasonable attorneys' fees;

e.  Grant Plaintiffs such other and further relief as the Court deems just and proper.


RESPECTFULLY SUBMITTED,

**COHEN PLACITELLA AND ROTH PC**

/s/Christopher Placitella

Christopher M. Placitella (2202497)
127 Maple Avenue
Red Bank, New Jersey 07701
Phone: 732-747-9003
Facsimile: 732-747-9004

*Attorneys for Plaintiff*

# APPENDIX

A1.     On 5/12/2017, SummaCare, Inc. entered into an assignment with MSP Recovery, LLC. Said assignment included the following language "[c]lient hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its successors and assigns, any and all of Client's right, title, ownership and interest in and to all Claims existing on the date hereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies for Client that Client had, may have had, or has asserted against any party in connection with the Claims and all rights and claims against primary payers and/or third parties that may be liable to client arising from or relating to the Claims, including claims under consumer protection statutes and laws, and all information relating thereto, all of which shall constitute the 'Assigned Claims'" The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties. The assignment was entered under Ohio law. On 6/12/2017, MSP Recovery, LLC entered into an assignment with MSP Recovery Claims, Series LLC, irrevocably assigning its right to recover payments as assigned from SummaCare, Inc. Said assignment included the following language "Assignor . . . irrevocably assigns, sells, transfers, conveys, sets over and Delivers to Assignee and its successors and assigns, any and all of Assignors right, title ownership and interest in and to the 'Assigned Claims', 'Claims', [']sic]Assigned Assets' and 'Assigned Documents' . . . whether based in contract, tort, statutory right, and any and all rights (including but not limited to, subrogation) to pursue and/or recover monies that Assignor had, may have had, or has asserted against any party pursuant to the Agreement, including claims under consumer protection statutes

130

and laws, any and all rights and claims against primary payers and/or third parties that may be liable to Client arising from or relating to the Claims and all information relating thereto." This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties. This second assignment was entered under Delaware law. Consideration was given between each party in executing these assignments.

A2.     On 12/16/2014, Interamerican Medical Center Group, LLC (IMC) entered into an assignment with MSP Recovery, LLC. Said assignment included the following language "[c]lient appoints, directs, and, otherwise, irrevocably assigns all of Client's rights as it pertains to the rights pursuant to any plan, State or Federal statute(s) whatsoever directly and/or indirectly for any of its members and/or plan participants, and/or its rights pursuant to any agreement…." The assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties. The assignment was entered under Florida law. On 2/20/2015, MSP Recovery, LLC entered into an assignment with MSPA Claims 1, LLC, irrevocably assigning its right to recover payments as assigned from Interamerican Medical Center Group, LLC (IMC)." Said assignment included the following language "[a]ssignor hereby irrevocably assigns, transfers, conveys, sets over, and delivers to Assignee or its assigns any and all of Assignor's right, title, ownership and interest in and to all rights and entitlements, that Assignor has, may have had, or has asserted against third parties arising from or relating to the Claims." This second assignment contract was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties. This second assignment was entered under Florida law.